**Reed HODGES and Angelia Hodges a/k/a Angela Hodges, Appellants–Defendants,**

v.

**Timothy SWAFFORD, Appellee–Plaintiff.**

No. 55A01–0604–CV–166.

Court of Appeals of Indiana.

April 3, 2007.

Vincent S. Taylor, Bloomington, IN, Attorney for Appellants.

Steven Sharpe, Marcy Wenzler, Indiana Legal Services, Bloomington, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Reed Hodges and Angelia Hodges a/k/a Angela Hodges (collectively, "the Hodgeses") appeal the trial court's order in favor of Timothy Swafford on the issue of liability and its award of damages in the amount of $21,150.00. We affirm in part, reverse in part, and remand.[1]

### Issues

The Hodgeses present several issues, which we consolidate and restate as follows:

I. Whether the trial court erred in determining that the Hodgeses violated the Truth in Lending Act ("TILA");

II. Whether the trial court erred in determining that the Hodgeses were subject to liability under the Real Estate Settlement Procedures Act;

III. Whether the trial court erred in determining that the Hodgeses were subject to liability under the Indiana Deceptive Consumer Sales Act; and

IV. Whether the trial court abused its discretion by awarding Swafford damages in the amount of $21,150.00.

### Facts and Procedural History

Swafford, a retired laborer, has a sixth grade education and is illiterate, except that he can read numbers and sign his name. In March 2002, Swafford separated from his wife, who had handled the couple's finances. Shortly thereafter, Swafford learned that she had missed several mortgage payments on the marital residence, which was also Swafford's childhood home. On June 7, 2002, Swafford's divorce property agreement was finalized. Pursuant to the terms of that agreement, he received the marital residence and was to refinance the two outstanding mortgages within ninety days to remove his wife from those obligations. In the months prior to June 7, 2002, he had approached several loan companies about obtaining a loan; his applications were denied because of his prior bankruptcy filing, as well as the impending foreclosure on his home. On June 7, 2002, Swafford went to Indiana Mortgage Funding ("IMF") in Blooming-

---

1. We heard oral argument on March 6, 2007, in Indianapolis. We commend counsel for their excellent presentations, which assisted us in making our decision.

ton, Indiana, and met with mortgage broker Hope Seitzinger. He told Seitzinger that he wanted to apply for a loan to pay off the two mortgages on his home, make some home repairs, and to pay off his car loan and some other debts. His loan application showed the requested loan amount as $52,000.00, with an estimated value of the property of $95,000.00, and liens against the property in the amount of $33,000.00. The application was denied.

Swafford asked Seitzinger if she knew of any way that he could save his home. Seitzinger said that she knew a person who had invested in real estate in the past and might be willing to help Swafford. She called her brother, Reed Hodges, and suggested that he purchase Swafford's house and sell it back to him on land contract. Reed said that he would agree to purchase Swafford's house if he could make a profit and "pay off some of my stuff." Tr. at 125. Hodges talked it over with his wife, Angelia, and the couple agreed to participate in the transaction. Seitzinger explained to Swafford that he would have to transfer the deed to his house to the Hodgeses and buy the house back on land contract. She believed that he understood that the Hodgeses would pay off the mortgages on his house and that he would receive no additional money from the transaction.

Seitzinger prepared the land contract using a standard IMF form. She also originated a $57,400.00 loan for the Hodgeses that would enable them to purchase Swafford's home.[2] Seitzinger set up the date and time for the closing of these two transactions, and she met with Swafford and his nephew prior to the closing.

The land contract required Swafford to buy back his home for $59,000.00, with interest at the rate of 8.50 percent per annum. The Hodgeses also agreed to pay Swafford $4,000.00 at the time of closing, which Swafford had requested for the purpose of paying off some personal debts. The trial court determined that the value of the benefit Swafford received from the loan was $39,514.17.[3] Tr. at 200. Swafford and the Hodgeses had never spoken to each other until the day of the closing, when they had a casual conversation with no discussion of the terms of the agreement. Seitzinger was not present at the closing. The Hodgeses concede that they did not provide Swafford with any disclosures regarding the transaction. Prior to closing, no one informed Swafford that Reed and Seitzinger were related.

Swafford and his nephew thought that Swafford would receive additional money following the closing, apparently because Swafford and Seitzinger had initially attempted to obtain a loan in an amount that would allow Swafford to pay off some debts and make various home repairs. Swafford did not receive additional funds after the closing, and he and his nephew visited IMF and asked Seitzinger for an explanation of the fees and costs included in the loan. She failed to provide the requested information. Swafford hired an attorney, who made similar requests, to which the Hodgeses also failed to respond. On July 17, 2003, Swafford filed a complaint against the Hodgeses, Seitzinger,

---

**2.** The Hodgeses agreed to pay off the two mortgages on the house, which totaled $31,817.50. After paying Swafford $4,000.00 at closing, plus closing costs of $3,696.67, they were left with $17,885.83, which they planned to use to pay off credit card bills, to repair an investment property, and to buy siding, windows, and doors for their own home.

**3.** This figure is the total of $31,817.50 (outstanding mortgages paid by Hodgeses) + $4,000.00 (amount paid to Swafford at closing) + $3,696.67 (costs of transaction paid by Hodgeses).

and IMF expressing his intent to rescind the transaction.[4]

The complaint alleged violations of the federal Truth in Lending Act, the federal Home Ownership and the federal Equity Protection Act, the federal Real Estate Settlement Procedures Act, the Indiana Deceptive Consumer Sales Act, and the Indiana Loan Broker Act. Swafford also claimed fraud, fraudulent misrepresentation, constructive fraud, and equitable estoppel. On October 14, 2004, the trial court granted summary judgment in favor of IMF and denied summary judgment as to the Hodgeses and Seitzinger. A bench trial as to liability was held on February 15, 2005. On August 5, 2005, the trial court ruled in favor of Swafford and against the Hodgeses on the TILA and HOEPA claims. The court also found that the Hodgeses violated RESPA and DCSA and that Swafford had established the elements of equitable estoppel. The court found in favor of the Hodgeses on the remaining claims. It also ruled in favor of Seitzinger on all claims. On September 8, 2005, the Hodgeses filed a motion to correct error, which was denied on September 19, 2005.

On February 6, 2006, the trial court held a hearing on damages and equitable relief. On March 23, 2006, the court ordered the Hodgeses to transfer title to the home back to Swafford by warranty deed and ordered Swafford to sign a promissory note and mortgage on the property in favor of the Hodgeses, reduced by $21,150.00. The court also ordered the Hodgeses to pay $900.00 directly to Swafford, apparently to satisfy the delinquent balance on his car loan.[5] Finally, it ordered the Hodgeses to file a warranty deed, promissory note, mortgage, and a satisfaction of the land contract with the county recorder. The Hodgeses now appeal.

### Standard of Review

In considering our standard of review, we note that the trial court did not include findings of fact in its order. In reviewing a general judgment issued following a civil bench trial, we must affirm if there is substantial evidence of probative value supporting the judgment on any legal theory. *Eagledale Enter., LLC v. Cox,* 816 N.E.2d 917, 922 (Ind.Ct.App.2004). We neither reweigh evidence nor judge the credibility of witnesses, and we consider only the evidence most favorable to the prevailing party along with all reasonable inferences to be drawn therefrom. *Id.* The interpretation of a statute such as TILA is a question of law, which we review under a de novo standard. *Clarian Health Partners v. Evans,* 848 N.E.2d 763, 765 (Ind.Ct.App.2006), *trans. denied.* We owe no deference to a trial court's legal conclusions. *Id.*[6]

### Discussion and Decision
### I. TILA/HOEPA Liability

First, the Hodgeses allege that the trial court erred in concluding that they violated TILA in the course of their transaction with Swafford. By way of background, we

---

4. The complaint stated in pertinent part: "Mr. Swafford hereby rescinds the transaction for failure to provide the disclosures required by law." Appellants' App. at 16. Presumably because the Hodgeses denied the applicability of TILA in this case, they did not follow TILA's rescission procedures, and the land contract remained in effect, with Mr. Swafford making timely payments.

5. At the damages hearing, Swafford's counsel explained that his car had been repossessed due to his inability to make payments on the car loan. The Hodgeses do not appeal the $900.00 award.

6. We note that the Hodgeses failed to include a standard of review in their brief, as required by Indiana Appellate Rule 46(A)(8)(b).

note that Congress enacted TILA in 1968 to provide statutory protections and remedies to consumers entering into consumer credit transactions. See 15 U.S.C. § 1601 *et seq.* In 1994, the HOEPA Amendment was added to TILA to address the problem of predatory lending practices to high-risk borrowers. See 15 § U.S.C. 1602(aa). TILA's implementing regulations, also known as "Regulation Z," are found at 12 C.F.R. pt. 226. HOEPA is implemented through 12 C.F.R. § 226.32, also known as "Section 32." The Board of Governors of the Federal Reserve System also publishes an Official Staff Commentary, beginning at · 12 C.F.R. § 226 (Supp.1), which provides helpful interpretations of Regulation Z.

Here, Swafford argued, and the trial court agreed, that the Hodgeses were "creditors" under TILA and that the land contract was in fact a "high cost loan" pursuant to HOEPA. These two conclusions led to the court's determination that the Hodgeses were required to make TILA disclosures to Swafford regarding the cost of the loan. The Hodgeses concede that they made no disclosures to Swafford. They contend that TILA does not apply to this transaction, however, and that therefore no disclosures were required.

### A. TILA

■ The primary issue before us then is whether TILA governed this transaction.

First, in order to be held liable under TILA, the Hodgeses must fall within the statute's definition of "creditors." TILA states, in pertinent part:

> (f) The term "creditor" refers only to a person who both
>
> (1) regularly extends, whether in connection with loans, sales or property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and
>
> (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.... *Any person who originates 2 or more mortgages* [7] *referred to in subsection (aa) of this section [commonly known as HOEPA] in any 12–month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this chapter.*

15 U.S.C. § 1602(f).

The Hodgeses concede that the debt arising from the consumer credit transac-

---

7. Pursuant to 15 U.S.C. § 1602(aa)(1),

    A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—

    (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

    (B) the total points and fees payable by the consumer at or before closing will exceed the greater of—

    (i) 8 percent of the total loan amount; or

    (ii) $400.

    (Emphasis added.) Although the agreement between Swafford and the Hodgeses was a "land contract," it was clearly intended by both parties to be a loan transaction with the deed as security.

tion at issue in this case was payable to them, thus satisfying subsection (f)(2) above. At first glance, it appears that the Hodgeses do not fall within TILA's definition of "creditor" because the evidence indicates that they do not "regularly" extend consumer credit. Indeed, the loan they made to Swafford was the first loan they had ever made. However, the italicized language above clearly broadens the definition of "creditor" to include persons beyond those who regularly make loans.

Swafford argues that the Hodgeses are "creditors" because they originated one high-cost loan through Seitzinger, a mortgage broker. The Hodgeses deny that the loan in this case was originated "through a mortgage broker." We note that TILA does not define "mortgage broker." The primary rule of statutory construction is to ascertain and give effect to the intent of the statute's drafters. *Hendrix v. State,* 759 N.E.2d 1045, 1047 (Ind.2001). The best evidence of that intent is the language of the statute, and all words must be given their plain and ordinary meaning unless otherwise indicated by the statute. *Id.* In order to determine the plain and ordinary meaning of words, we may properly consult English language dictionaries. *Youngblood v. Jefferson County Div. Of Family and Children,* 838 N.E.2d 1164, 1171 (Ind.Ct.App.2005), *trans. denied* (2006). According to Black's Law Dictionary, a "mortgage broker" is "[a]n individual or organization that markets mortgage loans and brings lenders and borrowers together." BLACK'S LAW DICTIONARY 206 (8th ed.2004).

The Hodgeses' arguments are based on the trial court's conclusions. First, they claim that because the trial court granted summary judgment in favor of IMF, the court "necessarily concluded" that Seitzinger's participation in the transaction was not in her capacity as an IMF employ-

ee and thus not in her capacity as a mortgage broker. Appellants' Br. at 13. Also, the Hodgeses contend that Seitzinger was not acting as a mortgage broker because the trial court concluded that "there is insufficient evidence in this matter to establish that she was a wrongdoer in this case." *Id.* at 8. TILA does not impose liability upon mortgage brokers for the violations at issue in this case; therefore, the trial court's conclusion that Seitzinger was not a "wrongdoer" under TILA does not mean that it also concluded that she did not act as a mortgage broker. In fact, the trial court impliedly concluded that Seitzinger acted as a mortgage broker when it determined that the Hodgeses were "creditors" under TILA.

The evidence clearly shows that Seitzinger was an active participant in the transactions between the Hodgeses and Swafford. In drafting the land contract, she contacted Swafford and the Hodgeses to discuss the information required to complete the contract, such as the schedule of payments, etc. She obtained a pre-comparables sales analysis on Swafford's home. She also originated the Hodgeses' loan. Reed Hodges testified, "Hope found a loan for me . . . . like I said, I always went through a mortgage broker." Tr. at 127. Seitzinger took the Hodgeses' application and ordered an appraisal of Swafford's house, the property which secured the loan. The title insurance company faxed a copy of the title insurance commitment and the company's invoice to Seitzinger's attention at IMF. She testified regarding the level of her involvement in the Hodgeses' loan:

SEITZINGER: I was the originator in that transaction.

COUNSEL: Okay. And what does that mean to be the originator.

SEITZINGER: To take the applications and basically structure the loan.

COUNSEL: Okay. And what part did you not do in this transaction?

SEITZINGER: I didn't close the loan.

COUNSEL: Okay.

SEITZINGER: I didn't . . .

COUNSEL The closing . . . would you normally do a closing?

SEITZINGER: No.

COUNSEL: Usually there would be a settlement agent or closing agent.

SEITZINGER: Correct.

COUNSEL: . . . from a title company.

SEITZINGER: Yes.

COUNSEL: And that's what happened here.

SEITZINGER: Yes.

COUNSEL: So the part that you played was a part that you would normally play in these transactions in any event?

SEITZINGER: Yes.

Tr. at 99–100.

In sum, Seitzinger brought the parties together, acted as their liaison prior to the closing, and prepared the documents necessary to complete the transactions. The Hodgeses contend that Seitzinger and Reed Hodges were not acting as mortgage broker and creditor, but rather as sister and brother doing a personal favor for Swafford to save his childhood home. Whatever their motive or relationship, Seitzinger testified that she is a certified mortgage broker, and there is significant evidence that Seitzinger performed all the duties with regard to this transaction that she normally did in her capacity as a mortgage broker for IMF. It follows then that the evidence was sufficient to support the trial court's determination that the Hodgeses were creditors as defined by TILA.[8]

## B. HOEPA

■ Next, we must consider whether there is sufficient evidence to support the trial court's conclusion that the land contract between the Hodgeses and Swafford was a "high cost loan" as defined by HOEPA.[9] The HOEPA amendment contains a provision identifying a "mortgage" subject to HOEPA as one in which "the total points and fees payable by the consumer at or before closing will exceed the greater of—(i) 8 percent of the total loan amount; or (ii) $400." 15 U.S.C. § 1602(aa)(1)(B). The Hodgeses state that "there were no points or fees payable by Mr. Swafford 'at or before closing' " because the costs of the loan were financed over the entire life of

8. In support of its contention that Seitzinger acted as a mortgage broker, Swafford cites an unpublished decision with similar facts, *Hruby v. Larsen*, 2005 WL 1540130 (D.Minn. June 30, 2005). We note that this case has no precedential value before this Court because it was decided in another jurisdiction. It involved a preliminary injunction rather than a review of a trial on the merits. Pursuant to FRAP 32.1A, unpublished opinions issued before January 1, 2007, generally should not be cited, but a party may cite an unpublished opinion of that district if the opinion has persuasive value on a material issue and no published opinion of this or another court would serve as well. We would not address *Hruby* at all except for the fact that it was discussed extensively by both parties at oral argument. In *Hruby*, the plaintiffs visited a mortgage company hoping to find assistance to avoid foreclosure of their home. A broker with the company, Steven Larsen, informed them that he and his brother Daniel could help. The Hrubys executed a deed to Daniel Larsen and entered into a contract to repurchase the home. The court granted the Hrubys' motion for preliminary injunction, finding that they would likely succeed in showing that Daniel was a creditor under TILA "because he originated an extension of credit to the Hrubys through Steven, who acted as a broker." *Id.* at *3.

9. The trial court actually used the term "unconscionable" to describe the land contract. Appellants' App. at 8.

the loan. Appellants' Br. at 10. While Swafford concedes that he paid nothing to the Hodgeses at or before the closing, he claims that a significant portion of the amount he was obligated to pay under the land contract was "points and fees" under HOEPA.

As defined by the regulations governing HOEPA, "points and fees" include "all items required to be disclosed under [12 C.F.R.] § 226.4(a) and 226.4(b), except interest or the time price differential[.]" *See* 12 C.F.R. § 226.32(b)(1). One item defined in Section 226.4(a) is "finance charge": "The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a). Here, the value of the loan to Swafford was $39,514.17, and the cost of the loan was $19,485.83, resulting in a forty-nine percent (49%) finance charge—more than six times the percentage triggering HOEPA. Clearly, there was a very costly finance charge connected with the Hodgeses' extension of credit, but was it "payable" at or before closing?

The meaning of "payable" in the context of HOEPA is unsettled, and it appears to be an issue of first impression in Indiana. In 2003, the U.S. District Court, Western District of Tennessee held that fees and costs financed over the course of the loan are not "payable by the consumer at or before closing." *See Terry v. Cmty. Bank of N. Va.*, 255 F.Supp.2d 811, 817 (W.D.Tenn.2003). The *Terry* court stated:

> Black's Law Dictionary defines "payable" as follows:
>
>> Capable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable.

> A sum of money is said to be payable when a person is under an obligation to pay it. Payable may therefore signify an obligation to pay at a future time, but, *when used without qualification, [the] term normally means that the debt is payable at once*, as opposed to owing.
>
> BLACK'S LAW DICTIONARY 1016 (6th ed.1979) (emphasis added). Under this definition, even if the time for payment of points and fees on a "high cost" loan was unspecified, the points and fees would be "payable at once," as opposed to over the course of a loan. However, Congress specifically qualified the term "payable" with a time certain—i.e. the points and fees must be payable "at or before closing." 15 U.S.C. § 1602(aa)(1)(B). There is nothing ambiguous about the language of [Section] 1602(aa)(1)(B) which lends to another interpretation of this statute. Accordingly, the Court finds that a mortgage qualifies for TILA protections only where the mortgagor is required to pay certain points and fees at or before closing of a loan, not over the course of the loan.
>
> In the instant case, Plaintiffs admit that they "paid nothing at the closing." Thus, Plaintiffs' loans do not qualify as "high cost" HOEPA loans.

*Id.* at 816–17 (some citations omitted). At least two courts have accepted *Terry*'s reasoning. *See In re Collins*, 310 B.R. 299 (N.D.Miss.2004); *In re Sigle*, 310 B.R. 303 (N.D.Miss.2004); *In re Bell*, 309 B.R. 139 (E.D.Pa.2004).

In contrast to the *Terry* holding, Swafford cites *Short v. Wells Fargo Bank Minnesota*, 401 F.Supp.2d 549 (S.D.W.V. 2005). While the *Short* court's holding did not require it to determine the meaning of

"payable ... at or before closing,"[10] it nevertheless addressed the issue in dicta:

Although the facts in this case make it unnecessary for the Court at the summary judgment stage to further interpret the phrase "payable by the consumer at or before closing" in 15 U.S.C. § 1602(aa), nevertheless, this Court finds the interpretation of that phrase by [the *Terry* court] ... to be inapposite to the meaning Congress intended. Instead the term "payable" should be interpreted as meaning "legally enforceable" or "obligation to pay."....
[W]hile TILA is highly technical, it is a remedial statute. It was designed to protect consumers like the plaintiff here, not more sophisticated lending and financial institutions, who are able to control the structure of the loan transaction. Congress did not use the term "paid" in § 1602(aa), instead, it used the term "payable" which looks to the fact that the consumer bears the cost of those fees at the time of closing, not whether those fees were financed, paid separately or deducted from the loan proceeds. Given the statute's remedial purpose, the Court believes that to allow lenders and financial institutions to manipulate the payment of points and fees in these transactions to avoid triggering the HOEPA protections is unfair and defeats the purpose of the law. Accordingly, this Court agrees with the plaintiff that *Terry* and its progeny have been wrongly decided.

*Id.* at 562–63 (some citations omitted).

Also, the Northern District of Illinois has found that a broker's fee paid by the borrower after closing qualified as "points and fees" under HOEPA. *See Cunning-* *ham v. EquiCredit Corp. of Ill.,* 256 F.Supp.2d 785, 793 (N.D.Ill.2003). "The applicable clause at issue does not require 'payment' at or before closing. Rather [it] expressly provides that a mortgage that is subject to HOEPA requirements is one where 'the total points and fees payable by the consumer at or before closing' exceed 8 percent of the total loan amount." *Id.*

Swafford also finds support for his position in the Federal Reserve's Official Staff Commentary, to which we are to give great deference. *See Ford Motor Credit v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) ("[D]eference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive[.]"). The Commentary suggests that fees paid over the life of the loan should be considered as points and fees payable at or before closing. The following example appears in an explanation of the agency's interpretation of points and fees, using a hypothetical amount borrowed of $10,000.00:

If the consumer finances a $300 fee for a creditor-conducted appraisal and pays $400 in points at closing, the amount financed under § 226.18(b) is $9,900 ($10,000 plus the $300 appraisal fee that is paid to and financed by the creditor, less $400 in prepaid finance charges). The $300 appraisal fee paid to the creditor is added to other points and fees under § 226.32(b)(1)(iii).

Official Staff Commentary, § 226.32(a)(1)(ii)–1(i).

In the instant case, the Hodgeses paid a total of $31,817.50 to Swafford's creditors.

---

**10.** In *Short,* the court denied the loan servicer and assignee's motion for summary judgment, finding that a reasonable jury could conclude that certain settlement charges were paid by the borrower at the closing of the loan and that therefore, HOEPA requirements applied to the lender.

They paid $3,696.67 in fees related to the loan obtained to make these payments. They also provided Swafford with cash in the amount of $4,000.00. The transaction cost the Hodgeses and benefited Swafford in the amount of $39,514.17. The amount that Swafford was required to pay to the Hodgeses under the land contract was $59,000.00, which represents a profit of $19,485.83 for the Hodgeses. The Hodgeses requested that Seitzinger prepare the land contract for this amount (and originate their loan in the amount of $57,400.00) because it would allow them to pay off their own debt and complete some home improvement projects.[11]

In sum, the evidence shows that the Hodgeses fell within the TILA definition of "creditors" and that the land contract in this case was a "high cost loan" under the HOEPA amendment. Therefore, we must affirm the trial court's judgment that the Hodgeses are liable for violations of TILA related to their transaction with Swafford.[12]

## II. Real Estate Settlement Procedures Act ("RESPA")

Swafford concedes that he has no private right of action under RESPA and that the trial court's award of $150.00 should be reversed. He argues that the Hodgeses' violation of RESPA "illustrates [their] inequitable conduct[,]" but acknowledges that such violations have no impact on TILA, which provides "a complete basis for recovery" in this case. Appellee's Br. at 23.

## III. Indiana Deceptive Consumer Sales Act ("IDCSA")

The trial court found that the Hodgeses had violated IDCSA, but it did not attribute any damages to this violation. Swafford concedes that he has no private right of action under IDCSA, although he argues that the Hodgeses' IDCSA violation "illustrate[s] their inequitable conduct." Appellee's Br. at 23. As with RESPA, Swafford acknowledges that IDCSA violations have no impact on TILA claims and that TILA provides a complete basis for recovery in this case.

## IV. Damages

■ The computation of damages is strictly within the trial court's discretion. *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018, 1034–35 (Ind.Ct.App.2005). No degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the record. *Id.* However, an award may not be based upon mere conjecture or speculation. *Id.* To support an award of compensatory damages, there must be evidence that affords a legal basis for measuring the plaintiff's loss. *Id.* In other words, we "will not disturb an award for damages when the amount is within the

---

11. When asked how he decided upon the land contract amount of $59,000, Mr. Hodges stated,

> By breaking down my credit card bills, roughly ... and this is a guesstimate ... my credit card bills were around ... I think around 6,000 dollars. My siding for ... siding for my house with labor and material was roughly 4,000 ... 4 to 6,000. Windows and doors ... it's a big house. That's the one in Linton. Two story, five bedroom, three bath. I put vinyl windows in

and six panel doors. That roughly came to about 2,000 dollars there. And then I had the excess I just left in an account. Eventually after Mr. Swafford started paying ... he always paid his payment, he always has, I took the excess money I had and paid taxes with them on my other properties. Tr. at 125.

12. As we find in favor of Swafford under TILA, we need not address his equitable estoppel argument.

bounds of the probative evidence adduced at trial." *Id.* (quoting *Beyer v. State,* 258 Ind. 227, 236, 280 N.E.2d 604, 610 (1972)).

There are four categories of monetary damages for TILA violations, two of which the trial court applied in this case.[13] The trial court awarded actual damages of $17,000.00 and statutory damages totaling $4,000.00; however, the total of $21,000.00 was not an actual monetary recovery for Swafford. Rather, the court applied another TILA remedy by ordering rescission of the land contract. It ordered the Hodgeses to deed the Martinsville property back to Swafford and ordered Swafford to execute a promissory note and mortgage on the property in favor of the Hodgeses "for an amount of the principal remaining balance on the July 17, 2002 Land Contract, as of the date of this Order, minus $21,150.00 [14] in damages." Appellants' App. at 11.

The Hodges contend that the trial court's award is inequitable. They argue that they "took on a risk that no other ascertainable creditor was willing to take" and that the trial court's "decision on damages essentially holds that the Hodges[es] should be required to give Mr. Swafford a loan under terms and conditions that no other lender would provide." Appellants' App. at 26–27. While this may be so, had they also complied with the mandatory provisions of TILA there would have been no further legal recourse available to Swafford. The evidence supports the trial court's conclusion that TILA required the Hodgeses to disclose to Swafford the exorbitant cost of the loan and that they failed to do so. Thus, they are subject to TILA penalties, which include statutory damages, see 15 U.S.C. § 1640, and the forfeiture of the total finance charge through rescission. *See* 12 C.F.R. § 226.23(d)(1) ("When a consumer rescinds a transaction, ... the consumer shall not be liable for any amount, including any finance charge.").

▬▬▬ The trial court awarded statutory damages in the total amount of $4,000.00: "$2,000.00 for violation of the Truth in Lending Act" and "$2,000.00 for failure to take proper action upon rescission under TILA[.]" Appellants' App. at 10. It appears that the court found one violation for the Hodgeses' failure to make disclosures regarding the cost of the loan and a second violation for the Hodgeses' failure to follow TILA's rescission procedures. The trial court's award was within the bounds of the applicable TILA damages provision, which allows an award of "not less than $200 or greater than $2,000" for each of these violations. See 15 U.S.C. § 1640(a)(2)(A)(iii).

▬▬▬ As for TILA's remedy of rescission, which may differ from the more familiar process of common law rescission, Regulation Z provides detailed instructions regarding the steps that must be taken by the borrower and lender and the method of rescission available to the court. Swafford is entitled to rescission of the land contract because the Hodgeses violated TILA by failing to provide "material disclosures[.]" [15] Swafford exercised this

---

**13.** TILA allows recovery of four types of damages: (1) actual damages, (2) statutory damages, (3) costs of action and attorney fees for successful enforcement of rescission action, and (4) an amount equal to the sum of all finance charges and fees paid by the borrower in the case of a HOEPA loan. *See* 15 U.S.C. § 1640(a)(1)-(4).

**14.** The trial court's order includes $150.00 in damages for violating the Real Estate Sales and Practices Act. However, as discussed above, the parties now concede that Swafford had no private right of action under RESPA. Thus, the $150.00 award is invalid.

**15.** *See* 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered [to the borrower], the right to re-

right by sending a rescission letter to the Hodgeses and by filing his complaint. *See* 12 C.F.R. § 226.23(a)(2).

Once the loan is rescinded, the security interest or lien becomes automatically void, by operation of law. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(1). Within twenty days of receipt of the notice of rescission, the lender must return to the borrower any money or property that has been given to anyone in connection with the loan. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(2). Once the lender has terminated the security interest [16] and returned any money or property it received, the borrower is then required to tender any property or money received from the lender. 15 U.S.C. § 1635(b); 12 C.F.R. §§ 226.15(d)(3), 226.23(d)(3).

As a result of the rescission, the lender retroactively loses the right to charge fees on the loan. 12 C.F.R. § 226.23(d)(1). Therefore, in order to determine the amount of tender, one takes the amount of value the borrower actually received for his direct benefit and subtracts the total payments made by the borrower on the loan. In this case, Swafford received the direct benefit of $39,514.17, and as of February 2006, he had made fifty-four payments of $498.56, totaling $26,922.24. The remaining balance of $12,591.93, less the statutory damages of $4,000.00, leaves a tender amount of $8,591.93, owed by Swafford to the Hodgeses.

In sum, we conclude that the evidence supports the trial court's judgment in favor of Swafford on the issues of TILA and HOEPA liability. While the trial court did not award a specific amount of damages, its formula for damages appears to reveal an abuse of discretion.[17] Therefore, we remand with instructions to the trial court to order Swafford to execute a promissory note and mortgage in favor of the Hodgeses for the amount of $8,591.93, or, if necessary, a lesser amount to reflect any payments made by Swafford after February 2006.

Affirmed in part, reversed in part, and remanded.

BAKER, C.J., and VAIDIK, J., concur.

scind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first."); *see also* 15 U.S.C. § 1602(u) ("material disclosures" means disclosure of annual percentage rate, method of determining finance charge, amount of finance charge, amount to be financed, number and amount of payments, etc.).

**16.** As Swafford points out, the trial court did not require the Hodgeses to forfeit their security interest in the Martinsville house; rather, it required Swafford to execute a promissory note and mortgage in favor of the Hodgeses. The Hodgeses did not appeal this portion of the court's order.

**17.** At oral argument, Swafford's counsel stated that the exact amount of damages (other than statutory damages) awarded by the trial court had not yet been calculated and agreed upon by the parties, as the Hodges had not yet complied with the order. We note that the trial court used the "principal remaining balance" in its formula. TILA in effect gives Swafford a credit for interest paid as well as principal. According to the land contract, Swafford's monthly payments of $498.56 included "interest at the rate of 8.50 percent per annum on the unpaid balance, & monthly taxes & insurance, based upon the number of days since the previous payment." Appellants' App. at 22. We believe that our calculation of damages, shown above, complies more fully with TILA because it erases all of Swafford's liability for interest, fees, or costs of the loan. *See* 12 C.F.R. 226.23(d)(1).