# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 16 2020, 8:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Coleman
The Law Offices of Alan Lani
Louisville, Kentucky

ATTORNEY FOR APPELLEE
CIOBANU LAW, P.C.

Andrea L. Ciobanu
Ciobanu Law, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
OVIDIU MIHUTI

Rebecca J. Berfanger
RJ Berfanger Law, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Supervised Estate of Bogdan T. Mihuti:

Layla Cristina Mihuti,

*Appellant/Cross-Appellee,*

v.

Ciobanu Law, P.C., et al.,

*Appellees/Cross-Appellants.*

April 16, 2020

Court of Appeals Case No.
19A-ES-1945

Appeal from the Hendricks
Superior Court

The Honorable Peter R. Foley,
Special Judge

Trial Court Cause No.
32D05-1512-ES-256

**Bailey, Judge.**

# Case Summary

Bogdan Mihuti ("Bogdan") died intestate in 2015. After the estate was opened, litigation ensued that involved (1) Bogdan's estranged spouse, Layla Mihuti ("Layla"), and (2) Bogdan's brother, Ovidiu Mihuti ("Ovidiu"). Ovidiu was initially appointed as the personal representative and Eizabeth Ruh ("Ruh") was later appointed as the successor personal representative. At one point, Layla alleged that Ovidiu converted property, which led to a default judgment on the issue of liability. Layla also alleged that Ruh neglected the estate, which led to a settlement agreement. Throughout the case, there were disputes over the responsibility for fees incurred in the matter, including whether certain attorney's fees and personal-representative fees were recoverable against the estate. The disputes involved fees billed by Ciobanu Law, P.C. ("Ciobanu Law"), which represented Ovidiu and was involved in early estate-related filings, and Coffin, Coffin & Blackman ("Coffin"), which represented Ruh.

Layla now appeals and Ovidiu cross-appeals.[1]

We affirm.

---

[1] Ciobanu Law actively participates on appeal. However, Ruh and Coffin Law do not actively participate.

# Issues

Layla presents the following consolidated and restated issues:

1.  Whether the court abused its discretion in allowing the recovery of fees by Ciobanu Law, Ruh, and Coffin.

2.  Whether the court abused its discretion by declining to declare Ovidiu or Ciobanu Law responsible for attorney's fees due to the filing of purportedly meritless petitions.

3.  Whether the court abused its discretion in its valuation and categorization of certain property when it awarded damages on the conversion claim against Ovidiu.

Ovidiu presents the following consolidated and restated issues, which concern the claim of conversion that led to a default judgment and a damages award:

4.  Whether the court abused its discretion in denying a motion to set aside the default judgment.

5.  Whether the court abused its discretion in admitting certain evidence at the damages hearing.

6.  Whether the evidence of damages is too speculative.

# Facts and Procedural History

Bogdan died intestate in December 2015, at which time there was a pending petition to dissolve the marriage between Bogdan and Layla. About seven months before Bogdan died, Layla moved out of the marital residence—which

Bogdan owned—and sought an Order for Protection, alleging that Bogdan threatened violence and was both financially and emotionally abusive. A court issued an Ex Parte Order for Protection. At some point after the issuance of that order, Bogdan petitioned to dissolve the marriage. The protective order was eventually replaced with a no-contact order in the pending dissolution case.

[7] In late December 2015, Ovidiu—a resident of Canada—filed a Petition for Issuance of Letters of Administration and for Supervised Administration of the Estate. The court appointed Ovidiu as the initial personal representative. In January 2016, Ovidiu filed a Petition to Determine Heirship (the "Heirship Petition"), alleging that Layla was ineligible to inherit. In support of the Heirship Petition, Ovidiu cited two provisions of the Indiana Code concerning spousal heirship—one addressing abandonment and the other addressing adultery and abandonment. The Heirship Petition was eventually withdrawn.

[8] In February 2016, the trial court appointed Ruh as the successor personal representative. Bogdan's house later went into foreclosure and his vehicle was impounded. These events led to allegations that Ruh neglected the estate. Ruh, with the assistance of counsel, defended against these allegations. A settlement was reached with no admission of liability. Although Coffin had been assisting Ruh with the estate-related matters, Ruh obtained different counsel to defend against the allegations of neglect—but Coffin had some level of initial involvement. Eventually, Ciobanu Law, Ruh, and Coffin sought to recover fees against the estate. Layla challenged whether the fees were recoverable. She also argued that the Heirship Petition was meritless, and that Ovidiu and

Ciobanu Law should be responsible for all attorney's fees incurred in the matter. The court declined to hold Ovidiu and Ciobanu Law responsible. It also determined that most of the fees were recoverable against the estate. Ruh recovered—in pertinent part—$1,358.80 for services as personal representative from July 27, 2017, through June 18, 2018; Coffin recovered $21,835.00 in attorney's fees; and Ciobanu Law recovered $6,691.32 in attorney's fees.

[9] Layla filed a Petition for Recovery on Behalf of the Estate, alleging that Ovidiu converted property when he had access to Bogdan's house. Ovidiu did not personally appear at a hearing on the conversion claim—however, his counsel was present. When Ovidiu failed to personally attend the hearing, Layla sought a default judgment, arguing that Ovidiu had been issued a subpoena and was a critical witness. Layla also pointed out that the court had previously ordered Ovidiu to personally attend the hearing. The court granted Layla's request, entering default judgment against Ovidiu on the issue of liability. The court then heard evidence regarding damages. Layla presented evidence about the value of various items—among them, several watches and a Versace bracelet. Layla sought $70,146.99 in damages on the conversion claim, characterizing the converted property as household goods belonging to a surviving spouse.

[10] Following the hearing, the court entered a written order in which it awarded Layla $42,546.99 for the conversion of household goods. The court awarded the estate $10,890.00 for the conversion of watches and watch winders, which the court determined "were not 'household goods' and were estate property." Appellant's App. Vol. II at 61. In calculating damages, the court noted that it

did not identify credible evidence of the value of a certain gold watch and so it "value[d] the watch at $0.00." *Id.* The trial court also noted a failure of proof concerning the value of the Versace bracelet: "Layla testified that she purchased the bracelet for the sum of $10,000.00 but failed to provide a current value for the bracelet. Any valuation by the Court would be speculative and Layla has failed to meet her burden to establish the value of the bracelet." *Id.* at 62.

[11] Layla and Ovidiu filed motions to correct error—and Ovidiu sought to set aside the default judgment. The court denied pertinent portions of those motions.

[12] Layla now appeals. Ovidiu cross-appeals.

# Discussion and Decision

[13] In general, we review a ruling on a motion to correct error for an abuse of discretion. *State v. Reinhart*, 112 N.E.3d 705, 709-10 (Ind. 2018). However, to the extent the motion rests on a question of law, our review is *de novo*. *Id.* at 710. This appeal also involves the denial of a motion to set aside a default judgment, which we review for an abuse of discretion. *Huntington Nat. Bank v. Car-X Assoc. Corp.*, 39 N.E.3d 652, 655 (Ind. 2015). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances. *Fulp v. Gilliland*, 998 N.E.2d 204, 210 (Ind. 2013).

[14] Where—as here—the trial court enters findings of fact and conclusions of law on its own motion, we review for clear error. Ind. Trial Rule 52(A). "A finding or conclusion is clearly erroneous if the appellate court's review leaves it with

the firm conviction that a mistake has been made." *Salyer v. Washington Regular Baptist Church Cemetery*, No. 20S-PL-102, 2020 WL 1164272, at \*2 (Ind. March 11, 2020). In conducting our review, we shall give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." T.R. 52(A). Indeed, our role is not to reweigh the evidence. *See id.* We look to whether the evidence supports the findings and the findings support the judgment. *S.H. v. D.W.*, 139 N.E.3d 214, 220-21 (Ind. 2020). Moreover, to the extent the findings do not cover all of the issues, we apply a general-judgment standard, T.R. 52(D), under which we may affirm on any theory consistent with the evidence, *Perdue Farms, Inc. v. Pryor*, 683 N.E.2d 239, 240 (Ind. 1997).

# Recovery of Fees

[15] In intestate matters, a court may compensate a personal representative for services as the court "deem[s] just and reasonable." Ind. Code § 29-1-10-13. Moreover, "[a]n attorney performing services for the estate at the instance of the personal representative shall have such compensation therefor out of the estate as the court shall deem just and reasonable." *Id.* "The amount of fees to be awarded is within the trial court's discretion and will not be disturbed absent an abuse of discretion." *Ford v. Peoples Tr. & Sav. Bank*, 651 N.E.2d 1193, 1194 (Ind. Ct. App. 1995), *trans. denied*. "In determining a reasonable amount of fees, the trial court may consider many factors, including the labor performed, the nature of the estate, difficulties in recovering assets or locating devisees, and the peculiar qualifications of the [personal representative]." *Id.* As to a

reasonable amount of attorney's fees, the court may also consider the guidelines for attorney's fees set forth in the Indiana Rules of Professional Conduct. *Id.*

[16] Here, the court determined that both Ruh and Coffin could recover fees from the estate. We note that neither Ruh nor Coffin filed a brief. We therefore need not develop arguments for them and may reverse upon a showing of *prima facie* error. *Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind. 2008). In this context, *prima facie* error is error at first sight, on first appearance, or on the face of it. *Id.*

## Ruh

[17] The trial court determined that Ruh could recover $1,358.80 for her services from July 27, 2017, through June 18, 2018, for which Ruh billed at a rate of $60 per hour. Layla challenges the full amount, arguing that the associated invoices "essentially represent[] two categories: Preparation for and defense of the claim against [Ruh] . . . and her presence at the trial May 24, 2018, regarding the fees payable to [Ciobanu Law]." Br. of Appellant at 13. Layla claims the fees are unreasonable because Ruh was not acting to further the interests of the estate.

[18] As to attending court on May 24, 2018, entries on the pertinent invoice show fees of about $500. Although Layla suggests that attendance was optional, Layla has not directed us to a court order expressly excusing Ruh—the personal representative—from attending the hearing held in the estate cause. Thus, we are not persuaded that billing for attendance at that hearing was unreasonable.

[19] As to the remaining $800 or so, the invoices include entries for paying bills, issuing checks, depositing checks, gathering documents, making calls, sending

e-mails, and running reports. Layla suggests that the invoices "essentially" reflect work defending the allegations against Ruh. Yet, Layla did not develop an adequate record to support her preferred categorization of the fees. Indeed, apart from isolated testimony that one $60 entry involved an e-mail to Ruh's defense counsel, there is no indication that the fees relate to Ruh's defense.

[20] Ultimately, we are not persuaded that the trial court abused its discretion in deciding that $1,358.80 was a just and reasonable amount to compensate Ruh for about eleven months of service as a personal representative. Moreover, even if we identified error, the amount at issue here is *de minimis*. *See generally D & M Healthcare, Inc. v. Kernan*, 800 N.E.2d 898, 900 (Ind. 2003) (discussing the "practical doctrine" that "proclaims that the law does not redress trifles").

## Coffin

[21] Layla challenges approximately $11,000 of the amount recovered by Coffin, which billed at a rate of $275 per hour. Layla summarizes her challenge:

> [T]he time objected to breaks out as follows, of which there is no factual dispute: 10.9 hours working on the foreclosure action, 4.5 hours necessary to recover the BMW from impound, 3.8 hours in conference with Andrea Ciobanu, 10.4 hours in defense of the claim for recovery against Elizabeth Ruh, 0.5 hours dealing with correspondence regarding the decedent's 401(k) account which was ignored, 4.6 hours of general review, and 6.0 hours for Roger Coffin's presence at trial regarding the fees payable to [Ciobanu Law] (For greater detail, *see* the cross-examination of Roger Coffin during the 8/31/18 hearing, found at Transcript Vol. 2 p. 160 line 12 through p. 174 line 2, which is incorporated by reference but not fully restated.) There was no factual dispute

that the hours occurred as stated and that they were for the matters described; only that as a matter of law said items are not entitled to priority payment from the funds of the estate because said matters were not, as a matter of law, done in reasonable furtherance of any bona fide interest of the estate.

Br. of Appellant at 12.

[22] Layla challenges 15.9 hours—or $4,372.50 of the $11,000 or so—for work related to (1) the foreclosure action; (2) the impounded vehicle; and (3) the 401(k) account. Layla points out that "any objection to attorney's fees . . . was expressly reserved from the settlement" with Ruh. Br. of Appellant at 11. She contends that "the need for work by legal counsel arose from the neglect and unreasonable delay in administration by . . . Ruh," and so "any liability for the associated legal fees must be borne by . . . Ruh individually, not paid by the funds of the estate." *Id.* Yet, irrespective of why this work was necessary, there is no question that the work benefitted the estate. Thus, we are unpersuaded that the court abused its discretion by allowing Coffin to recover these fees.

[23] As to the six hours for attendance at a hearing, Layla has not demonstrated that the court excused Ruh—and, by extension, counsel—from attending a hearing held in the estate cause. We are also unpersuaded that the court abused its discretion by allowing the recovery of 3.8 hours of conference time between Coffin—counsel for the successor personal representative—and Ciobanu Law— counsel for the initial personal representative. Counsel from Coffin explained that a conference was held because prior counsel "had recollection of some of the facts of how things unfolded, she knew some things . . . that we had to try to

piece together, you know, who had access to the house, who didn't, what items did Ovidiu remove, which ones were brought back, how did they get to our office." Tr. Vol. 2 at 167. In this protracted estate matter, we cannot say the court awarded unreasonable fees for conferencing. Along these lines, we are unpersuaded of an abuse of discretion regarding 4.6 hours of general review.

[24] That leaves the 10.4 hours that Layla alleges went to "defense of the claim for recovery against Elizabeth Ruh." Br. of Appellant at 12. As counsel from Coffin explained, at least some of that time was spent reviewing Layla's petition against Ruh—a document filed in the estate cause—as counsel "wanted to get the facts" about that matter. Tr. Vol. 2 at 170. We cannot say it is unjust or unreasonable to permit Coffin to recover time for reviewing that filing. *See* I.C. § 29-1-10-13 ("An attorney performing services for the estate at the instance of the personal representative shall have such compensation therefor out of the estate as the court shall deem just and reasonable."). To the extent a subset of those 10.4 hours crossed over into the defense of Ruh's interests, we are again confronted with a *de minimis* amount. Indeed, between Ruh's *de minimis* fees discussed above and this subset of 10.4 hours, Layla's challenge to defense-related fees concerns a few thousand dollars—at most. We therefore decline to disturb that portion of the trial court order concerning fees for Ruh and Coffin.[2]

---

[2] Layla points out that Ruh and Coffin do not actively participate in this appeal. She cites a 1933 case for the proposition that the failure to actively participate on appeal "may be considered a confession of error." Reply Br. of Appellant at 6. However, we adhere to our well-established standard allowing reversal upon a showing of *prima facie* reversible error. *See Morton*, 898 N.E.2d at 1199. Layla has not made that showing.

# Ciobanu Law

[25]     Layla argues that Ciobanu Law is not entitled to $6,691.32 for fees related to the early estate-related filings for Ovidiu—*i.e.*, the work on opening the estate and preparing the Heirship Petition. According to Layla, "the entirety of the work" giving rise to the fees "was of no legal merit." Br. of Appellant at 10.

## *Opening the Estate*

[26]     Layla asserts that Ovidiu—a resident of Canada—"could not have served as personal representative based on the petition filed." *Id.* at 9. Directing us to qualifications set forth in Indiana Code Section 29-1-10-1, Layla argues that Ovidiu did not strictly comply with certain statutory subsections because he did not "list a joint personal representative who was a resident of Indiana, nor did he post a bond of any value." Br. of Appellant at 9. Yet, regardless of whether the challenged petition strictly complied with the statute, Ovidiu was appointed personal representative and his petition initiated the proceedings that eventually resolved Bogdan's estate to the benefit of his heirs—including Layla. Thus, we disagree with Layla's contention that the work was of no legal merit.

## *Heirship Petition*

[27]     Layla briefly argues that the Heirship Petition was meritless because Ovidiu lacked standing to "complain about an inheritance" because he was not an heir. Br. of Appellant at 9. However, even if we assume that the Heirship Petition would not have benefitted Ovidiu, a successful petition would have benefited

Maria Mihuti—Bogdan's mother—who was a remaining heir. Thus, we are not persuaded that any standing issue rendered the petition devoid of merit.

[28] Turning to the Heirship Petition, Ovidiu alleged "good cause to believe" that, when Bogdan died, Layla was "living in adultery and/or had abandoned [Bogdan]." Appellant's App. Vol. II at 66. The petition cites Indiana Code Section 29-1-2-14, which provides as follows: "If either a husband or wife shall have left the other and shall be living at the time of his or her death in adultery, he or she as the case may be shall take no part of the estate or trust of the deceased husband or wife." The petition also cites Indiana Code Section 29-1-2-15, which provides as follows: "If a person shall abandon his or her spouse without just cause, he or she shall take no part of his or her estate or trust."

[29] Layla argues that the Heirship Petition was meritless because it was "legally impossible" to establish that Layla abandoned Bogdan. *Id.* She points out that it was Bogdan who initiated proceedings to dissolve the marriage, seeking bifurcated proceedings to expedite the dissolution. Layla claims that Bogdan "affirmatively sought dissolution . . . and separation." *Id.*

[30] In petitioning to dissolve the marriage, Bogdan alleged that the "[p]arties separated and ceased living as Husband and Wife on or about May 17, 2015." App. Vol. II at 69. There is evidence that Layla left the marital residence when Bogdan was out of town. Layla then sought a protective order and, at some point thereafter, Bogdan petitioned to dissolve the marriage. During the

proceedings on the protective order, Layla claimed that she fled because Bogdan threatened violence and was both financially and emotionally abusive.

[31] In defending the recovery of its fees, Ciobanu Law elicited testimony from Simona Mihuti ("Simona")—Ovidiu's wife—who claimed that she went to the Ciobanu Law office and told counsel that Layla had engaged in adultery and "was planning for many years to leave Bogdan." Tr. Vol. 2 at 106. There was also testimony about Ciobanu Law's theory for the Heirship Petition, which was that Layla left Bogdan "well before the dissolution" and the protective order Layla sought "was kind of a ruse." *Id.* at 60. Moreover, there is also evidence that Ciobanu Law obtained a copy of an apartment lease executed on May 7, 2015. The apartment lease shows two residents: Layla and a Nicolae.

[32] Although Layla argues that seeking dissolution of marriage cuts off any possible claim of abandonment, we are not persuaded that the law is well-settled in this area. Indeed, because there was a colorable argument to support the Heirship Petition, we discern no abuse of discretion with respect to the associated fees.[3]

### *Fee Shifting*

[33] Focusing on fee-shifting provisions in the Indiana Code, Layla claims that Ovidiu "is liable for every party's attorney's fees for having filed a meritless

---

[3] In the pertinent order, the trial court noted in passing that the Heirship Petition "was filed but then withdrawn and no appreciable fees were incurred in defense of the [Heirship] Petition." Appellant's App. Vol. II at 60. Layla challenges the trial court's characterization of her attorney's fees. However, because we regard the challenged remark as mere surplusage, we need not address the accuracy of the remark.

petition." Br. of Appellant at 13. Layla also directs us to Trial Rule 11 and asserts that Ciobanu Law should be held jointly and severally liable because the Heirship Petition was "groundless" and "taken primarily for the purpose of harassing or maliciously injuring Layla Mihuti." *Id.* at 16.

[34] As we have identified legal merit, we conclude that the trial court did not abuse its discretion by declining to shift the responsibility for the disputed fees.

# Conversion

## Default Judgment

[35] Layla alleged that Ovidiu converted property while serving as the personal representative and was therefore liable under Indiana Code Section 29-1-16-1. When Ovidiu failed to personally attend a hearing on that claim of conversion, the trial court entered a default judgment against him on the issue of liability. The trial court later denied Ovidiu's motion to set aside the default judgment.

[36] "[T]he proper procedure . . . for setting aside an entry of default or grant of default judgment thereon is to first file a Rule 60(B) motion to have the default or default judgment set aside." *Siebert Oxidermo, Inc. v. Shields*, 446 N.E.2d 332, 337 (Ind. 1983). "Trial Rule 60(B) motions address only the procedural, equitable grounds justifying relief from the legal finality of a final judgment, not the legal merits of the judgment." *In re Paternity of P.S.S.*, 934 N.E.2d 737, 740 (Ind. 2010) (quoting *Mid-W. Fed. Sav. Bank v. Epperson*, 579 N.E.2d 124, 129 (Ind. Ct. App. 1991)). In pertinent part, Trial Rule 60(B) provides as follows:

On motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment, including a judgment by default, for the following reasons:

(1)     mistake, surprise, or excusable neglect;

(2)     any ground for a motion to correct error, including without limitation newly discovered evidence, which by due diligence could not have been discovered in time to move for a motion to correct error[] under Rule 59;

(3)     fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4)     entry of default or judgment by default was entered against such party who was served only by publication and who was without actual knowledge of the action and judgment, order or proceedings;

(5)     except in the case of a divorce decree, the record fails to show that such party was represented by a guardian or other representative . . . ;

(6)     the judgment is void;

(7)     the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

> (8)     any reason justifying relief from the operation of the judgment, other than those reasons set forth in sub-paragraphs (1), (2), (3), and (4).

[37]   "A movant filing a motion for reasons (1), (2), (3), (4), and (8) must allege a meritorious claim or defense," T.R. 60(B)—*i.e.*, a showing that vacating the judgment will not be an empty exercise. *Outback Steakhouse of Fla., Inc. v. Markley*, 856 N.E.2d 65, 73 (Ind. 2006). "One way to meet this requirement is to identify evidence that, if credited, demonstrates that a different result would be reached if the case were retried on the merits." *Id.* at 81. "A 'meritorious defense' is also established by showing that the judgment was 'unfairly procured.'" *Id.* (quoting *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994)).

[38]   In ruling on a Trial Rule 60(B) motion, the trial court should exercise its discretion "in light of the disfavor in which default judgments are held." *Allstate Ins. Co. v. Watson*, 747 N.E.2d 545, 547 (Ind. 2001). Indeed, "Indiana law strongly prefers disposition of cases on their merits." *Coslett v. Weddle Bros. Const. Co., Inc.*, 798 N.E.2d 859, 861 (Ind. 2003). "Any doubt of the propriety of a default judgment should be resolved in favor of the defaulted party." *Id.*

[39]   Here, Ovidiu sought relief by focusing on Trial Rule 55. This rule permits entry of default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise comply with these rules and that fact is made to appear by affidavit or otherwise . . . ." T.R. 55(A). Rule 55(B) requires notice and a hearing prior to entry of default. Moreover, Rule 55(C)

states that "[a] judgment by default which has been entered may be set aside by the court for the grounds and in accordance with the provisions of Rule 60(B)."

[40] In moving to set aside the default judgment, Ovidiu alleged that he was not afforded notice under Trial Rule 55. Ovidiu asserted that, had he been provided notice of potential default, "perhaps he could have made other arrangements" to attend the hearing. Motion to Correct Error & Set Aside Default at 4, *In re Estate of Mihuti*, No. 32D05-1512-ES-256 (Mar. 4, 2019).[4]

[41] Layla does not dispute a lack of notice. She instead argues that Trial Rule 55 "was not the trial court's basis for entry of default." Reply Br. of Appellant at 7. Layla contends that the court exercised its "inherent authority to sanction improper or abusive conduct." *Id.* She asserts that Ovidiu—a critical witness for the claim of conversion—failed to personally attend the hearing, despite a subpoena and a separate court order requiring Ovidiu to personally attend.

[42] In any case, regardless of whether the default judgment arose through Trial Rule 55 or through the inherent power of the court, Ovidiu failed to allege a meritorious defense. He makes no attempt to deny the allegations. Moreover, as to any question of due process, we discern nothing procedurally unfair about

---

[4] The motion is not in the appendices. We located the document through the Odyssey case-management system. *See* Ind. Appellate Rule 27 ("The Record on Appeal shall consist of the Clerk's Record and all proceedings before the trial court . . . , whether or not transcribed or transmitted to the Court on Appeal.").

maintaining the entry of default where Ovidiu alleged only that, with notice, "perhaps" he would have arranged to attend a hearing on the matter.

[43] "[N]either the judicial system nor society are served by performing essentially meaningless acts which only serve to delay other litigants in having their day in court." *Teegardin v. Maver's, Inc.*, 622 N.E.2d 530, 533 (Ind. Ct. App. 1993). Further, technical noncompliance with the notice requirements of Trial Rule 55(B)—standing alone—is not a sufficient basis to set aside a judgment. *See id.*

[44] We discern no abuse of discretion in the treatment of the Rule 60(B) motion.

## Damages

[45] "The computation of damages is strictly a matter within the trial court's discretion." *Romine v. Gagle*, 782 N.E.2d 369, 382 (Ind. Ct. App. 2003) (quoting *Gasway v. Lalen*, 526 N.E.2d 1199, 1203 (Ind. Ct. App. 1988)), *trans. denied*. "No degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the record." *Hodges v. Swafford*, 863 N.E.2d 881, 891 (Ind. Ct. App. 2007). Yet, "an award may not be based upon mere conjecture or speculation." *Id.* "To support an award of compensatory damages, facts must exist and be shown by the evidence which afford a legal basis for measuring the plaintiff's loss." *Gasway*, 526 N.E.2d at 1203. To that end, "the damages must be referenced to some fairly definitive standard, such as market value, established experience, or direct inference from known circumstances." *Roy Bayer Tr. v. Red Husky, LLC*, 13 N.E.3d 415, 419 (Ind. Ct. App. 2014) (quoting *Romine*, 782 N.E.2d at 382)). We "will not

disturb an award for damages when the amount is within the bounds of the probative evidence . . . ." *Beyer v. State*, 280 N.E.2d 604, 610 (Ind. 1972).

## *Evidence*

[46] At the damages hearing, the court admitted certain deposition testimony over Ovidiu's objection. Ovidiu briefly argues that admitting the evidence was an abuse of discretion. He claims that the challenged testimony was prejudicial because Layla cannot otherwise demonstrate that Ovidiu removed items from the house. At bottom, however, this argument is directed toward liability, which was established through the default judgment—not through the evidence. In any case, there was cumulative evidence that Ovidiu took photographs inside the house and that, on a later date, photographed items were no longer in the house. Thus, even if we assume error, we are not persuaded of any prejudice. *See* Ind. App. R. 66(A) (directing this Court to disregard harmless error).

[47] Ovidiu also argues that the evidence supporting the damages award is impermissibly speculative. Much of the evidence consists of printed webpages that Layla found, which display purchase prices for similar property. Ovidiu contends that Layla lacked "training or experience in valuation or determining fair market value" and that insufficient evidence supports a damages award when the evidence is derived from "a few Google searches" by a non-expert. Appellee Br. of Ovidiu at 20. According to Ovidiu, the court "should not have based its damages calculation by allowing Layla to look at a picture, perform a Google search for a like item, and speculate as to the item's current value." *Id.* However, in light of the pervasiveness of e-commerce, we are not persuaded

that this type of evidence is insufficient to support a damages award. Moreover, to the extent that Ovidiu characterizes other evidence as guesswork, having reviewed the matter, we conclude that sufficient evidence supports the award.

## *Valuation*

[48] Layla argues that she is entitled to damages for a Versace bracelet and a gold watch. Layla sought $10,000 for the bracelet and $3,000 for the watch—and the court rejected these amounts. Layla essentially argues that the court was obligated to accept her valuations. Pointing out that Ovidiu did not offer alternative values, Layla asserts that rejecting her evidence and awarding no value "flies in the face of fact and logic, and amounts to error as a matter of law." Br. of Appellant at 17. However, contrary to Layla's suggestion, a court is not bound to accept the proffered value of a chattel. *See, e.g.*, *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 221 (Ind. 2010) ("[T]he amount of damages is governed by the evidence, not by the amount requested."). Here, it seems the court concluded that Layla did not meet her burden of providing reliable, credible evidence to support damages for these items—and it is not our role to reweigh evidence. Thus, we are not persuaded of an abuse of discretion.

## *Categorization*

[49] In general, household goods (1) acquired during marriage and (2) in possession of both spouses become the sole property of the surviving spouse. I.C. § 32-17-11-29. As our legislature has not defined household goods in this context, this Court eventually adopted the following definition: "those articles with which a

residence is equipped, other than fixtures, designed in their manufacture as instruments of the household, and embrace the articles necessary, convenient, or ornamental, requisite to enable [a person] not merely to live, but to live in a convenient and comfortable manner." *In re Estate of Roberts*, 27 N.E.3d 1136, 1140 (Ind. Ct. App. 2015) (quoting *Kramer v. Beebe*, 115 N.E. 83, 85-86 (Ind. 1917)). "Whether an item or group of items of personal property qualifies as a household good should be determined on a case-by-case basis." *Id.*

[50] At the damages hearing, Layla testified that Bogdan "had a large collection of watches." Tr. Vol. 3 at 129. She sought to recover the value of several watches and watch winders, which the trial court valued at $10,890. The court awarded the value of those items to the estate—not to Layla—"conclud[ing] that the watches possessed by the decedent at the time of his death were not 'household goods' and are therefore property of the estate." Appellant's App. Vol. II at 61. The court cited *Roberts*, in which this Court concluded that a $500,000 gun collection did not constitute household goods where the collection—stored in the basement—"went unused, untouched, and even unseen by the [spouses]." *Roberts*, 27 N.E.3d at 1141. The *Roberts* Court noted that it did "not mean to suggest . . . that guns or collections of other items may not be household goods" but that the "specifics" of the collection made it "such that it falls outside the definition of household goods" that this Court has adopted in this context. *Id.*

[51] Layla asserts that "while the decedent's watches were of a not insignificant value, they were not so far in excess of the ordinary value of a man's personal jewelry as to make them anything other than household goods." Br. of

Appellant at 16.  This argument assumes that jewelry falls within the definition of household goods, but Layla cites no support for that proposition.  Applying the definition of household goods set forth above—which the court applied in *Roberts*—we cannot say that a residence is "equipped" with jewelry such that the jewelry is an "instrument[] of the household."  *Roberts*, 27 N.E.3d at 1140 (quoting *Kramer*, 115 N.E. at 85-86).  Thus, Layla has not demonstrated that the court abused its discretion in its categorization of the watch-related items.

# Conclusion

[52]  To the extent there was error in allowing Ruh and Coffin to recover fees, any error was *de minimis*.  Moreover, the trial court did not abuse its discretion in allowing Ciobanu Law to recover its fees, and it did not abuse its discretion in declining to order Ovidiu and Ciobanu Law responsible for all fees incurred in this matter.  Turning to the default judgment on liability for conversion, because Ovidiu did not allege a meritorious defense, the court did not err in declining to set aside the judgment.  As to the damages hearing, we are not persuaded of reversible error in the admission of evidence, and we discern no abuse of discretion concerning the challenged aspects of the damages award.

[53]  Affirmed.

Kirsch, J., and Mathias, J., concur.