FREDERICKA HOMBERG WICKER, Judge.
 

 12Appellant Kathleen Johnson Parnell asserts an array of federal and state claims against appellee The Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2 (“the bank”),
 
 [1]
 
 
 *880
 
 the assignee mortgage holder. Specifically, Ms. Parnell contends that the bank violated the Federal Truth in Lending Act, 15 U.S.C. § 1601
 
 et seq.
 
 (“TILA”), as amended by the Federal Home Ownership and Equity Protection Act, 15 U.S.C. § 1639
 
 et seq.
 
 (“HOEPA”) and The Real Estate Settlement Procedures Act (RES-PA), 12 U.S.C. § 2605. .With respect to state based claims, Ms. Parnell contends that the bank wrongfully foreclosed. In part, she claims that the bank violated the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401,
 
 et seq.
 
 (“LUTPA”) and La.C.C. art. 2315. These claims arise out of a mortgage loan that was closed on May 9, 2001 and which the bank now holds as assignee. The instant matter arose from the bank’s execu-tory process proceeding in which the property secured by the mortgage was seized but not sold.
 

 ^Presently before the Court is the judgment granting the bank’s motion for summary judgment and dismissing the claims. For the following reasons, we reverse in part, affirm in part and we remand for further proceedings.
 

 Procedural History
 

 Ms. Parnell executed a promissory note and mortgage in favor of EquiCredit on May 9, 2001. On October 30, 2001, Na-tionsCredit Financial Services Corporation d/b/a EquiCredit (10401 Deerwood Park Blvd., Jacksonville, Florida) assigned its rights to EquiCredit Corporation of America. October 30, 2001, EquiCredit Corporation of America (10401 Deerwood Park Blvd., Jacksonville, Florida) assigned its rights to Bank of New York (5 Penn Plaza, 16th Fir., New York, New York Attention: MES-Corporate Trust). The assignment from EquiCredit Corporation of America to Bank of New York also states that it is assigned to The Bank of New York, TR U/A dtd 12/01/2001(E QCC Trust 2001-2). On March 24, 2004, The Bank of New York, Trust U/A dtd 12/01/2001(EQCC Trust 2001-2), acting solely in its capacity as Trustee for EQCC Trust 2001-2 transferred the mortgage note to The Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2.
 

 On October 16, 2004, The Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2 filed the instant executory process petition against Ms. Parnell in which it attached various exhibits including the original promissory note and a certified copy of the act of mortgage in authentic form. The bank alleged that Ms. Parnell was in default and that it had a right to accelerate the sums secured by the mortgage. The trial judge signed an order on April 19, 2004 directing the Sheriff to seize and sell the property that was secured by the mortgage.
 

 |4On May 17, 2004, Ms. Parnell filed a petition to enjoin the seizure and sale and/or for damages and/or the return of the seized property. She raised various causes of action and defenses in support of her claim for damages.
 

 The Bank filed a motion for summary judgment asserting that Ms. Parnell had no claim for damages based on any of her theories of recovery.
 
 [2]
 
 Ms. Parnell filed an opposition to the motion. At the hearing, both parties introduced the exhibits that were attached to their respective motions and- opposition into evidence. The evi
 
 *881
 
 dence consisted in part of letters from Ms. Parnell’s attorney, Mr. Breeden, and his responses to those letters. The evidence also included affidavits. One of the affidavits was by Mr. Blackmer who attested that EquiCredit was a subsidiary of Bank of America.
 

 After conducting the hearing, the trial court granted the bank’s motion for summary judgment.
 

 Summary Judgment Law
 

 Summary judgments are reviewed
 
 de novo
 
 on appeal, with the reviewing court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate; whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law.
 
 Louisiana Safety Ass’n of Timbermen Self-Insurers Fund v. Louisiana Ins. Guar. Ass’n,
 
 09-0028, p. 5 (La.6/26/09), 17 So.3d 350, 353 (Citations omitted).
 

 Home Ownership and Equity Protection Act (HOEPA)
 

 Congress enacted The Truth in Lending Act to “ ‘to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and |ficredit card practices.’ ”
 
 Beach v. Ocwen Federal Bank,
 
 523 U.S. 410, 412, 118 S.Ct. 1408, 1409-10, 140 L.Ed.2d 566 (1998),
 
 citing
 
 15 U.S.C. § 1601(a);
 
 Mourning v. Family Publications Service, Inc.,
 
 411 U.S. 356, 363-368, 93 S.Ct. 1652, 1657-1660, 36 L.Ed.2d 318 (1973). Accordingly, the Act requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower’s rights.
 
 Id.,
 
 523 U.S. at 412, 118 S.Ct. at 1410,
 
 citing
 
 §§ 1631, 1632, 1635, 1638. A creditor’s failure to comply with these disclosure requirements may result in actual and statutory damages.
 
 Ngwa v. Castle Point Mortg., Inc.,
 
 2008 WL 3891263, *7 (S.D.N.Y.2008),
 
 citing
 
 15 U.S.C. § 1640(a). Additionally, if a creditor fails to provide a consumer with material disclosures when the loan is secured by the consumer’s “principal dwelling,” the consumer has “the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required ... whichever is later.”
 
 Id., quoting
 
 15 U.S.C. § 1635(a). If the required material disclosures are not delivered, the rescission period expires “three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first.”
 
 Id., quoting
 
 15 U.S.C. § 1635(f) and
 
 citing
 
 12 C.F.R. § 226.23(a)(3).
 
 See also: In re Lombardi,
 
 195 B.R. 569, 571-72 (Bankr.D.R.I.1996) (Failure to provide certain disclosures pursuant to 15 U.S.C. § 1635, extended the right of rescission for three years as provided in 12 C.F.R. § 226.23(a)(3). Any consumer who has the right to rescind a transaction under § 1635 may rescind the transaction as against any assignee of the obligation. 15 U.S.C. § 1641(c).
 

 The Truth in Lending Act as amended by HOEPA and Regulation Z of the Federal Reserve Board, 12 C.F.R. § 266.1,
 
 et seq.,
 
 provides that when a consumer ftloan violates the Act, the consumer is entitled to rescind the loan, to recover monies and other property given to the creditor, and to cancellation of any mortgages made in connection with the loan.
 
 Zeno v. Colonial Mortg. and Loan Corp.,
 
 08-246, p. 6 (La.App. 5 Cir. 11/25/08), 4 So.3d 93, 97,
 
 untimely unit not considered,
 
 09-0005 (La.3/6/09), 3 So.3d 473.
 

 
 *882
 
 The parties attached correspondence to then.' respective motions and opposition. The pertinent letters indicate the following:
 

 About two years after Ms. Parnell entered into the loan, on June 19, 2003, Mr. Breeden wrote a letter to Bank of New York on behalf of Ms. Parnell providing a notice of rescission. He alleged that rescission was proper because the loan was governed by HOEPA and EquiCredit failed to deliver all required material disclosures, including but not limited to two notices of HOEPA rescission; the disclosures stating that Ms. Parnell did not need to enter into the loan and that she could lose her home; and, the loan is one as defined by 15 U.S.C. § 1602(aa) and may not have a prepayment penalty attached to it.
 

 On July 24, 2003, Fairbanks Capital Corporation consumer affairs department at the loan servicing center located on Deerwood Park Blvd. in Jacksonville, Florida responded to the letter assuring that Fairbanks would contact the appropriate persons and provide a response. On September 15, 2003, Mr. Jeff Myers, Fairbanks’ consumer affairs consultant, wrote to Mr. Breeden stating that EquiCredit Corporation has requested to handle the issues regarding the notice of rescission. Mr. Myers instructed Mr. Breeden to contact Ms. Maggie Donnelly in the EquiCre-dit legal department at 9000 Southside Blvd. in Jacksonville, Florida. On September 24, 2003, Ms. Donnelly of the legal department for Bank of America at the Southside Blvd. address wrote to Mr. Breeden. She stated that the file had been recalled from Salt Lake City and a review of the file did not support |7his rescission claims. She said that the loan did not meet the threshold requirement under HOEPA because the total amount of points and fees on the loan was below 8%; namely, 6.7%. She also stated that Ms. Parnell was provided with accurate and compliant disclosures.
 

 On October 8, 2003, Mr. Breeden wrote to Ms. Donnelly stating that he had not been provided with a copy of the HUD-1 statement and asked that it be provided. On November 7, 2003, Ms. Donnelly provided Mr. Breeden with the HUD-1 statement.
 

 On December 30, 2003, James B. Dodd, Bank of America’s Senior Vice President wrote to Mr. Breeden stating that the loan did not meet the threshold requirement to trigger the disclosure requirements under HOEPA. He also said that Ms. Parnell had been provided with accurate and compliant disclosures. On January 6, 2004, Mr. Breeden responded to Mr. Dodd’s letter disagreeing with his conclusion.
 

 On January 23, 2004, Susan West of the Fairbanks Deerwood Park Blvd. office wrote to Mr. Breeden. She stated that the issue of rescission needed to be addressed by their legal department. Therefore, a copy of his letter and supporting documentation had been faxed to Salt Lake City for review and a determination. She said that he would be receiving a communication directly from a representative in the legal department. She advised him to contact Ms. Tammy Cramer if he had any further questions. On January 29, 2004, Mr. Breeden wrote to Ms. West stating that he contacted Ms. Cramer but she could do nothing because she never received the file. On February 3, 2004, Ms. Cramer from Fairbanks wrote to Mr. Breeden. She stated that the file had been recalled from Salt Lake City and reviewed. She said that a review of the file did not support his rescission claims. She said that their position remained the same as Bank of America’s. She | Jurther said that Ms. Parnell was given accurate and compliant disclosures and no permission to
 
 *883
 
 rescind existed. She also said that Ms. Parnell was due for the September 1, 2003 payment.
 

 In the petition, Ms. Parnell alleged several Truth in Lending Act violations. On appeal, she argues that the trial judge erred in finding that she had no HOEPA claim for damages pursuant to 15 U.S.C. § 1640(a)(2) and that she had no basis under HOEPA to rescind her loan transaction with the bank pursuant to 15 U.S.C. § 1635. She argues that the bank’s mortgage against her property had become void by operation of 15 U.S.C. § 1635(b) as a result of the HOEPA violations of nondisclosure. Thus, the foreclosure was wrongful.
 

 The bank moved for summary judgment on the basis that Ms. Parnell’s mortgage was not subject to the Home Ownership and Equity Protection Act (HOEPA).
 

 In her petition, Ms. Parnell stated that under HOEPA, the amendment to the Truth and Lending Act, a borrower can rescind the loan if the annual percentage rate is 10 points above the federal rate or the loan charges are more than
 
 8%
 
 above the amount financed. Ms. Parnell alleged that the “yield-spread premium” was paid by Ms. Parnell as part of the total settlement charge. And, because the “yield-spread premium” charges resulted in the total charges being above 8%, the loan is a HOEPA loan. Thus, special disclosures had to be made for the HOEPA loan and the disclosures were not made. Thus, Ms. Parnell alleged that she had a right to rescind the loan. Consequently, she alleged that because she could rescind the loan, the note and mortgage are void and not subject to executory process.
 

 Ms. Parnell asserts on appeal that her loan is a Home Ownership and Equity Protection Act Amendments (HOEPA) loan under 15 U.S.C. § 1602(aa) and | ^Regulation Z, 12 C.F.R § 226.32, giving her the right to rescind under § 1635 and enhanced actual damages under § 1640(a)(4).
 

 In
 
 Lopez v. Delta Funding Corp.,
 
 1998 WL 1537755, *5 (E.D.N.Y.1998) (footnotes omitted), the court held that to qualify as a HOEPA loan the loan must meet the enumerated requirements of 15 U.S.C. § 1602(aa). Among the requirements, the mortgage loan must satisfy either of two tests set forth in 15 U.S.C. § 1602(aa)(l). The first test applies when the annual percentage rate of interest for the loan transaction exceeds certain levels (15 U.S.C. § 1602(aa)(l)(A)). The second test applies when the total “points and fees” payable by the borrower at or before closing will exceed the greater of 8% of the total loan amount, or $400 (15 U.S.C.A. § 1602(aa)(1)(B)(i)).
 
 [3]
 
 At issue here is whether the second test applies.
 

 In this case the HUD-1 statement recites that a “yield to spread premium” of $1,264 was paid by the lender to the broker. In another section, it states: “Broker Fee Financed Out of Loan Proceeds to EXCEL MORTGAGE CORPORATION” in the amount of $3,400. Ms. Parnell argues that the “points and fees” calculation failed to include the “yield spread premi-
 
 *884
 
 m” And, if the $1,264 were included the percentage would be above 8%. Thus, the loan is a HOEPA loan.
 

 HOEPA, its implementing regulations, Regulation Z, 12 C.F.R. § 226.32 and the Official Staff Commentary of the Federal Reserve Board staff to Regulation Z, 12 C.F.R. § 226, Supp. I, provide a uniform method for calculating whether the “total points and fees” payable by the consumer at or before the | U)closing exceed 8% of the “total loan amount” (referred to as the “points and fees threshold requirement”).
 
 Lopez v. Delta Funding Corp.,
 
 1998 WL 1537755, *7 (E.D.N.Y.1998) (footnotes omitted).
 

 At issue here is the nature of the funds paid to the broker. Ms. Parnell contends, and the bank disputes, that her mortgage loan falls within 15 U.S.C. § 1602(aa) because the total points and fees she paid exceeded 8% of the total loan amount.
 

 Regulation Z, 12 C.F.R § 226.32(b)(l)(ii) pertinently defines “points and fees” as “[a]ll compensation paid to mortgage brokers.”
 

 “A yield spread premium, or ‘YSP,’ is a lump sum paid by a lender to a broker at closing when the loan originated by the broker bears an above-par interest rate.”
 
 Rendon v. Countrywide Home Loans, Inc.,
 
 2009 WL 3126400, *7 (E.D.Cal. Sept. 24, 2009)
 
 quoting Schuetz v. Banc One Mortg. Corp.,
 
 292 F.3d 1004, 1007 (9th Cir.2002). ‘Yield Spread Premiums” are fees paid by mortgage lenders to mortgage brokers that are based on the difference between the interest rate at which the broker originates the loan and the par, or market rate offered by the lender.
 
 Schuetz v. Banc One Mortg. Corp.,
 
 292 F.3d 1004, 1005 (9th Cir.2002),
 
 cert. denied, Schuetz v. Banc One Mortg. Corp.,
 
 537 U.S. 1171, 123 S.Ct. 994, 154 L.Ed.2d 913 (2003).
 

 HUD explained:
 

 Payments to brokers by lenders, characterized as yield spread premiums, are based on the interest rate and points of the loan entered into as compared to the par rate offered by the lender to the mortgage broker for that particular loan (e.g., a loan of 8% and no points where the par rate is 7.50% will command a greater premium for the broker than a loan with a par rate of 7.75% and no points). In determining the price of a loan, mortgage brokers rely on rate quotes issued by lenders, sometimes several times a day. When a lender agrees to purchase a loan from a broker, the broker receives the then applicable pricing for the loan based on the difference between the rate reflected Inin the rate quote and the rate of the loan entered into by the borrower....
 

 Lender payments to mortgage brokers may reduce the up-front costs to consumers. This allows consumers to obtain loans without paying direct fees themselves. Where a broker is not compensated by the consumer through a direct fee, or is partially compensated through a direct fee, the interest rate of the loan is increased to compensate the broker or the fee is added to principal. In any of the compensation methods described, all costs are ultimately paid by the consumer, whether through direct fees or through the interest rate.
 

 1999 Statement of Policy, 64 Fed.Reg. at 10081 (footnotes omitted).
 

 Ms. Parnell relies on Regulation Z, 12 C.F.R § 226.32(b)(l)(ii), which defines “points and fees” as “[a]ll compensation paid to mortgage brokers.” Ms. Parnell argues that this means all compensation paid to the mortgage broker are “points and fees.” Thus, despite the fact that the
 
 *885
 
 HUD-1 form recites that the lender paid the “yield to spread premium,” that amount constituted “points and fees” and thus should have been included in the total calculation of “points and fees.” Accordingly, Ms. Parnell contends that the inclusion of all “points and fees” would make the loan a HOEPA loan.
 

 We agree that under Regulation Z, the “yield to spread premium” is included in the definition of “points and fees.” We disagree that this ends the inquiry. We must next determine whether the “yield to spread premium,” which falls within the ambit of “all compensation paid to the broker” and are therefore defined as “points and fees” in Regulation Z, are “points and fees payable by the consumer at or before closing” in order to trigger HOEPA. 15 U.S.C. § 1602(aa)(l)(B)(i). Whether the loan is a HOEPA loan is determined by “the total points and fees payable by the consumer at or before closing.” It is not determined by the total compensation paid to the broker.
 

 The phrase “payable by the consumer at or before closing” has been subject to two interpretations. One favors the consumer and the other favors the lender. [12The bank argues that we should adopt federal jurisprudence that interprets the phrase strictly. For example, In
 
 In re Balko,
 
 348 B.R. 684, 692 (Bankr.W.D.Pa.2006), the court held that HOEPA “unequivocally states that the statute applies to certain mortgage transactions when ‘the total points and fees payable by the consumer
 
 at or before closing exceed
 
 ” the requisite percentage.
 
 Id.
 
 (emphasis in original). The court explained that “the payment of the ‘yield spread premium’ to the broker is paid and derived from the stream of interest generated
 
 over the life of the loan,
 
 and is not ‘payable by the consumer at or before the time of closing.’ ”
 
 Id.
 
 (emphasis in original). Thus, the court held that the “yield spread premium” is not included in the Points and Fees Test calculation set forth in 15 U.S.C. § 1602.
 
 Id.,
 
 (Citation omitted).
 

 An Illinois appellate court and a New York Federal District Court have held that fees and costs that are “financed” over the life of the loan are included within the meaning of “payable.”
 
 Hodges v. Swafford,
 
 863 N.E.2d 881 (Ind.App.2007),
 
 rehearing granted on other grounds,
 
 868 N.E.2d 1179 (Ind.App.2007);
 
 Macheda v. Household Finance Realty Corp. of New York,
 
 631 F.Supp.2d 181 (N.D.N.Y.2008).
 

 The bank argues that the “yield to spread premium” was not “financed” as were the other settlement charges and therefore this line of cases is distinguishable. The bank states that “[a]t best the [“yield to spread premium”] was an indirect payment paid over the course of the loan through interest payments that were not payable by Appellant at or before closing.” The bank further argues that since Ms. Parnell could pay off the loan early (as she did); there was no guarantee that she would have to account for the “yield to spread” premium.
 

 We find that the term “financed” does not compel a different result from
 
 Hodges
 
 and
 
 Macheda.
 
 In defining “payable,”
 
 Hodges
 
 and
 
 Macheda
 
 adopted the | ^well-reasoned dicta expressed in a federal West Virginia court,
 
 Short v. Wells Fargo Bank Minnesota, N.A.,
 
 401 F.Supp.2d 549 (S.D.W.Va.2005) — reasoning that is consistent with the Act’s remedial purpose.
 

 We now adopt the interpretation given by the
 
 Short-Hodges-Macheda
 
 line of cases in defining “payable.”
 

 Short
 
 explained:
 

 Although the facts in this case make it unnecessary for the Court at the summary judgment stage to further interpret the phrase “payable by the consum
 
 *886
 
 er at or before closing” in 15 U.S.C. § 1602(aa), nevertheless, this Court finds ... the term “payable” should be interpreted as meaning “legally enforceable” or “obligation to pay.” Moreover, it appears from the Federal Reserve Board’s Official Staff Interpretation of 12 C.F.R. § 226.32(b)(1)(h) that fees paid to a mortgage broker directly or indirectly are included in the calculation of fees and points ... Finally, while TILA is highly technical, it is a remedial statute. It was designed to protect consumers like the plaintiff here, not more sophisticated lending and financial institutions, who are able to control the structure of the loan transaction. Congress did not use the term “paid” in § 1602(aa), instead, it used the term “payable” which looks to the fact that the consumer bears the cost of those fees at the time of closing, not whether those fees were financed, paid separately or deducted from the loan proceeds. Given the statute’s remedial purpose, the Court believes that to allow lenders and financial institutions to manipulate the payment of points and fees in these transactions to avoid triggering the HOEPA protections is unfair and defeats the purpose of the law. Accordingly, this Court agrees with the plaintiff that
 
 Terry [v. Community Bank of Northern Virginia,,
 
 255 F.Supp.2d 811, 817 (W.D.Tenn., 2003) ] and its progeny have been wrongly decided.
 

 401 F.Supp.2d at 562-63 (Citations partially omitted).
 

 Furthermore, in
 
 Zeno v. Colonial Mortg. and Loan Corp.,
 
 08-246, pp. 3,11 (La.App. 5 Cir. 11/25/08), 4 So.3d 93, 95, 100,
 
 untimely writ not considered,
 
 09-0005 (La.3/6/09), 3 So.3d 473, this court adopted a consumer-oriented view to HOEPA. In
 
 Zeno,
 
 we considered an action to rescind a loan pursuant to nondisclosures under HOEPA. The trigger requirement at issue here was not an issue in that case. Specifically, we considered whether a loan’s inclusion of a prepayment penalty was improper. If so, the defendant was liable under HOEPA. | I4A1 though interpreting different provisions, we concluded that HOEPA and Regulation Z must be interpreted in favor of the borrower.
 

 An interpretation in favor of the borrower is consistent with HOEPA’s goals as explained in
 
 Williams v. Gelt Financial Corp.,
 
 237 B.R. 590, 594 (E.D.Pa. Aug 10, 1999) (internal quotations partially omitted; citations partially omitted):
 

 TILA was enacted in 1968 to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing. Consequently, it is not surprising that courts have held that TILA, as a remedial statute which is designed to balance the scales, ‘thought to be weighed in favor of lenders,’ is to be liberally construed in favor of borrowers. Nonetheless, finding that TILA’s protections were still inadequate, Congress added the protections and requirements of the Home Ownership and Equity Protection Act (“HOE-PA”) in 1994. HOEPA was designed to address the problem of “reverse redlining,” that is, the targeting of persons for “credit on unfair terms” based on their income, race, or ethnicity. S.Rep. No. 103-169, at 21 (1993). In an attempt to even the playing field, Congress enacted HOEPA
 

 to ensure that consumers understand the terms of such loans and are protected from high pressure sales tactics[.] ... [T]he legislation requires creditors making High Cost Mortgages to provide a special, streamlined High Cost Mortgage disclosure three days before consummation of the transaction. The bill also prohibits
 
 *887
 
 High Cost Mortgages from including certain terms such as prepayment penalties and balloon payments that have proven particularly problematic.
 

 Id.
 

 Accordingly, we find that the trial judge erred in granting summary judgment insofar as the HOEPA claim.
 

 Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA)
 

 The Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA) is codified in La. R.S. 51:1401,
 
 et seq.
 
 The law, however, exempts certain entities. La. R.S. 51:1406(1). The bank filed a motion for summary judgment asserting that as a matter of law Ms. Parnell has no claim under LUTPA because financial institutions like the bank are exempt from LUTPA.
 

 11sThe bank attached Mr. Gregory W. Blackmer’s affidavit to its motion. Mr. Blackmer, the Vice President of EquiCre-dit Corporation, attested to the following:
 

 The Bank of New York is a commercial bank chartered by the State of New York and is a member of the Federal Reserve. The Bank of New York is insured by the Federal Deposit Insurance Corporation.
 

 Ms. Parnell did not dispute the bank’s status as a federally insured financial institution. Rather, she asserted that because the bank is acting solely in its capacity as a trustee, the financial institution exemption under the act does not apply. Also, she asserts that the exemption does not apply in a case involving executory process. She states that she has alleged a claim of wrongful seizure in violation of LUTPA.
 

 La. R.S. 51:1406(1) was amended by 2000 La.Acts, 1st Ex.Sess. No. 34, § 3, effective April 14, 2000. In this case, the note was executed in 2001 and the executo-ry process was filed in 2004 — both after the 2000 amendment to La. R.S. 51:1406(1). Although the appellant cites the pre-2000 law as governing,
 
 [4]
 
 we conclude that the 2000 version applies here.
 
 [5]
 

 La. R.S. 51:1406(1) provides in pertinent part:
 

 The provisions of this Chapter shall not apply to:
 

 Actions or transactions subject to the jurisdiction of ... the commissioner of financial institutions
 
 [6]
 
 ... the financial institutions [o]f other states, or federal
 
 *888
 
 banking regulators who possess authority to regulate unfair or deceptive trade practices.
 

 1^2000 La.Acts, 1st Ex.Sess. No. 34, § 3, effective April 14, 2000 (footnote added).
 

 Business activities of national banks are controlled by the National Bank Act, 12 U.S.C. § 1
 
 et seq.,
 
 and regulations promulgated thereunder by the Office of the Comptroller of the Currency.
 
 Watters v. Wachovia Bank, N.A.,
 
 550 U.S. 1, 6-7, 127 S.Ct. 1559, 1564, 167 L.Ed.2d 389 (2007),
 
 citing
 
 12 U.S.C. §§ 24, 93a, 371(a). Here, the bank was acting in a fiduciary capacity to collect on an alleged defaulted loan. The Comptroller of the Currency, which regulates national banks, also regulates the fiduciary activities of national banks. 12 U.S.C. § 92a (1982). The Comptroller of the Currency may permit a national bank to act as a trustee. 12 U.S.C. § 92a(a).
 

 In
 
 Hayes v. Wells Fargo Home Mortg.,
 
 2006 WL 3193743, *6 (E.D.La.2006), the Federal Court interpreted Louisiana’s exemption applicable here which provided that LUTPA exempts from its application “actions or transactions subject to the jurisdiction of ... federal banking regulators who possess authority to regulate unfair or deceptive trade practices.”
 
 See:
 
 La. R.S. 51:1406(1). It found that a bank’s mortgage division was excluded from LUTPA because the bank was regulated by a federal banking agency. In that ease, the plaintiff/debtor disputed the amount of flood insurance premium required by the mortgage holder. The court concluded that the bank was regulated by the Office of the Comptroller of Currency, and the Comptroller directly regulated lender flood insurance requirements.
 
 Id., citing
 
 12 C.F.R. § 22.
 

 In the present case, the actions of the bank as a trustee are federally regulated. Furthermore, the regulations controlling the bank have a special provision related to unfair trade practices codified in 15 U.S.C. § 57a(f)(l).
 
 [7]
 

 | ]7Thus, as in
 
 Hayes,
 
 the actions of the bank are subject to “federal banking regulators who possess authority to regulate unfair or deceptive trade practices.” R.S. 51:1406(1).
 

 Therefore, although acting in the capacity of trustee, the bank’s actions in this case in collecting the loan through executo-ry process are exempt from LUTPA.
 
 Accord: First Financial Bank, FSB v. Butler,
 
 492 So.2d 503, 506 (La.App. 5 Cir.1986) (The bank, which was a federal savings bank extensively regulated with respect to unfair and/or deceptive practices under the United States Code, was exempt from LUTPA);
 
 Fidelity Bank and Trust Co. v. Hammons,
 
 540 So.2d 461, 465 (La.App. 1 Cir.1989),
 
 writ denied,
 
 544 So.2d 402 (La.
 
 *889
 
 1989) (Bank’s actions in proceeding through executory process to collect a loan were exempt under LUTPA).
 

 Accordingly, the trial judge correctly granted summary judgment dismissing the LUTPA claim.
 

 RESPA Claim
 

 In her petition, Ms. Parnell alleged that she was damaged as a result of the bank’s failure to provide her with an accounting as required by RESPA, 12 U.S.C. § 2605.
 

 The bank moved for summary judgment on the basis that although Ms. Parnell was notified of the proper address to send her request for an accounting, she failed to do so. According to the bank, there is no evidence that Ms. Parnell |issent any request for an accounting to the proper party and to the proper address pursuant to RESPA.
 

 The Real Estate Settlement Procedures Act (RESPA), 12 U.S.C., § 2605, the Ser-vicer Act, requires mortgage servicers of “federally related mortgage loans” to notify the borrower when the loan is transferred to another servicer and to provide a written acknowledgment of receipt of a “qualified written request” seeking an accounting of the loan within 20 days (excluding legal public holidays, Saturdays, and Sundays) of that request. 12 U.S.C. § 2605.
 
 See also:
 
 24 C.F.R., § 3500.21(e)(1). A servicer is defined as the person who was responsible for servicing the loan. It may include the person who made or holds the loan if that person also services the loan. 12 U.S.C. § 2605(i)(2). Pursuant to 12 U.S.C. § 2605(i)(3), “ ‘servicing’ means receiving any scheduled periodic payments from a borrower ... and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower.”
 

 The Servicer Act requires the following: (1) a written response acknowledging receipt of the request within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless action is taken within that period; (2) that the servicer take specific investigatory and/or corrective actions and provide the borrower with written notification of such actions within 60 days (excluding legal public holidays, Saturdays, and Sundays); and, (3) that the servicer refrain from providing information regarding overdue payments to any consumer reporting agency during the 60-day period. 12 U.S.C. § 2605.
 

 A “qualified written request” shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer. 12 U.S.C. § 2605(e)(1)(B). The “qualified written request” must include identifying information regarding the borrower and the account number as well as sufficient | ^information that the account is in error or sufficient detail to the servicer regarding other information sought by the borrower. 12 U.S.C. § 2605(e)(l)(B)(i) and (ii).
 

 The servicer’s failure to comply with the Servicing Act requirements results in liability to the servicer for a borrower’s actual damages. Additional statutory damages up to $1000 may be awarded if there is proof that the servicer has engaged in a pattern or practice of noncomplianee. 12 U.S.C. § 2605(f)(1)(A) and (B).
 

 Ms. Parnell contends that the bank did not meet its statutory obligation to provide an accounting. The bank contends that the letter was sent to an incorrect address because the bank is not the servicer. The Code of Federal Regulations concerning RESPA allows a servicer in its notice of transfer to set forth a separate address where any “qualified written request” must be sent. 24 C.F.R.
 
 *890
 
 § 3500.21(d)(3)(ii). Furthermore, 24 C.F.R. § 3500.21(e)(1) states: “By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests.”
 

 The bank argues that Fairbanks Capital Credit established a separate and exclusive office and address for the receipt and handling of “qualified written requests” by letter to Mr. Breeden notifying him of the exclusive Utah address.
 

 The bank attached two affidavits to his motion for summary judgment. Mr. Gregory W. Blackmer attested that he is employed by EquiCredit Corporation of America as Vice President. EquiCredit is a wholly-owned subsidiary of Bank of America. He examined records that were kept in the course of EquiCredit’s regularly conducted business activities. This is stated that the records of EquiCredit reflect that Fairbanks Capital Corp. was the servicer of Ms. Parnell’s loan on April 1, 2002 and thereafter.
 

 lapThe second affidavit was from Diane Weinberger. She attested that she is employed by Fairbanks Capital Corp. as Director. She said that Fairbanks became Select Portfolio Servicing Inc. on June 30, 2004. She attested that she examined the records of Fairbanks and Select regarding the Parnell mortgage. She said that the records were made at or near the time of the events described there in and from information transmitted by persons with knowledge of the events described herein who were routinely acting for Fairbanks and Select in recording the information described herein. She said that the records were kept in the course of regularly conducted business activities and it was Fairbanks’ and Select’s regular practice to make and keep these records. She also attested that she was familiar with Fairbanks’ usual mailing procedures for notifying mortgagors of a change in servicers. The records of Fairbanks and Select showed that Fairbanks became the servi-cer of the note executed by Ms. Parnell effective April 1, 2002.
 

 Ms. Weinberger attested that the usual mailing procedure for notifying mortgagor of a change in servicers included generating a notification letter, addressing a letter to the customer, applying proper postage to the letter, and delivering the addressed and postage-paid letter to the U.S. Postal Service. She said that Fairbanks followed these procedures on March 15, 2002. According to their records, on March 15, 2002, Fairbanks sent a letter to Ms. Parnell by Fairbanks’ usual mailing procedures stating that Fairbanks was the ser-vicer of her note. She attached a true and correct copy of the letter.
 

 Ms. Parnell attached an affidavit in opposition to the motion stating that she never received a notice of default from Fairbanks but she did not specifically dispute receipt of the notice of the change in servicing. However, Mr. Breeden in a letter to a paralegal with Bank of America stated that his client had never received anything concerning a change in ownership and/or servicer. The attached letter to 12i Ms. Weinberger’s affidavit contains a notification of the fact that Fairbanks Capital Corp. is the loan servicing center for the Parnell note. It listed the Fairbanks address and specifically stated that that address was the address to which Ms. Parnell was to send a “qualified written request.” The address was listed as: Fairbanks Capital Corp., Loan Servicing Center, Customer Service Department, Deerwood Park Blvd., Jacksonville, FL 32256.
 

 Although it could have done so in that notice, Fairbanks did not give a separate
 
 *891
 
 exclusive office address for the mailing of a “qualified written request.”
 

 October 8, 2003, Mr. Breeden sent a letter to Ms. Margaret Donnelly, a paralegal with Bank of America’s legal department at 9000 Southside Blvd., Jacksonville, FL 32256. He asked that that letter serve as a “qualified written request” and that he be provided ■with a copy of the file and all of the accounting, documents, payment records, and service records since the loan was serviced by Fairbanks and-or Bank of New York. The October 8, 2003 “qualified written request” was not sent to the Fairbanks’ address stated on its notification of change in servicing.
 

 The servicer’s notification is codified in 12 U.S.C. 2605(b)(1): “Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person.” The regulation provides that “each transferor servicer and transferee servicer of any mortgage servicing loan shall deliver to the borrower a written Notice of Transfer, containing” certain required information about the servicer and the transfer. 24 C.F.R. § 3500.21(d)(l)(i). 24 C.F.R. § 3500.11 states: “The provisions of this part requiring or permitting mailing of documents shall be deemed to be satisfied by placing the document in the mail (whether or not received by the addressee) addressed to the addresses stated in the loan application |22or in other information submitted to or obtained by the lender at the time of loan application or submitted or obtained by the lender or settlement agent, except that a revised address shall be used where the lender or settlement agent has been expressly informed in writing of a change in address.” Thus, this notice provision does not require actual receipt on the part of the borrower.
 

 The RESPA notice requirement of the change in servicing was met in this case. However, Ms. Parnell is seeking damages under another RESPA provision: the ser-vicer’s failure to respond to her “qualified written request.”
 

 Mr. Breeden began corresponding with various entities on June 19, 2003 when he requested a rescission of the loan based on various alleged Truth in Lending violations. His first letter was directed to the Bank of New York at Penn Plaza. In July 2003, he received a reply from Fairbanks at the Deerwood Park Blvd. address in Jacksonville, Florida. Fairbanks assured him that it would contact the appropriate persons and reply to his inquiry. Fairbanks stated that if he had any additional questions to contact Jeff Myers, the consumer advocate. A few months later, on September 15, 2003, Fairbanks through Mr. Jeff Myers at the Deerwood Park Blvd. address in Jacksonville, Florida wrote to Mr. Breeden informing him that Fairbanks had acquired the servicing of the loan on April 1, 2002. But, EquiCredit requested to handle the issues concerning the notice of rescission. He advised Mr. Breeden to contact Ms. Donnelly in the EquiCredit legal department at Southside Boulevard in Jacksonville, Florida regarding rescission and “for further questions or concerns.”
 

 On September 24, 2003, Bank of America through Margaret Donnelly, its paralegal, responded to Mr. Breeden’s request for rescission. She stated that the Bank of New York had only recently forwarded his rescission request to her andj^that the file had been recalled from Salt Lake City. She stated that she found no basis for permitting rescission.
 

 Apparently, relying on Mr. Myers’s statement that he should direct further questions or concerns to Ms. Donnelly, Mr. Breeden, on October 8, 2003 sent a letter
 
 *892
 
 to Ms. Donnelly and asked that the letter serve as a “qualified written request.”
 

 On November 7, 2008 Ms. Donnelly responded that they were only the “Master Servicer” under an agreement with Bank of New York and that his request for an accounting should be directed to the loan servicer, Fairbanks, at an address in Salt Lake City Utah. She advised him that a notice of change in servicing was made by Fairbanks on or before April 1, 2002. Therefore, apparently from this letter, Bank of America was the Master Servicer.
 

 In his affidavit, Mr. Blackmer attested that EquiCredit is a wholly-owned subsidiary of Bank of America.
 

 On December 16, 2003 Mr. Breeden wrote to Mr. Myers at Fairbanks Deer-wood Park Blvd. address in Jacksonville, Florida expressing his confusion. He wrote that Ms. Donnelly had advised Mr. Breeden to contact Bank of New York for the accounting information he requested. He asked that Mr. Myers put them in contact with the party who could settle the matter as soon as possible.
 

 Susan West, a consumer advocate at the Fairbanks Deerwood Park address responded to that letter on January 28, 2004. She stated that a copy of Mr. Breeden’s letter and supporting documentation had been faxed to Salt Lake City for review and a determination. In the interim, she advised him to contact Ms. Tammy Cram-er of the legal department.
 

 On January 29, 2004, Mr. Breeden wrote to Ms. West stating that he called Ms. Cramer and Ms. Cramer could do nothing because she never received the file. |24He expressed confusion regarding the specific pooling and servicing agreement under which this loan is probably under.
 

 On February 3, 2004, Ms. Cramer wrote to Mr. Breeden on behalf of Fairbanks. She stated that the file had been recalled from Salt Lake City and a review of that did not support his rescission claims. She also attached a copy of Ms. Parnell’s payment history and noted that Ms. Parnell was due for the September 1, 2003 payment.
 

 On February 20, 2004, Mr. Breeden sent a letter to Mr. Fisher with consumer affairs at the Fairbanks Deerwood Park address referring to the Cramer letter. He stated that Ms. Parnell was disputing that she was in default since she made the payments and Fairbanks returned it her with a note they were doing so until the dispute was settled. He asked that Fairbanks correct its records.
 

 The bank argues that it is not the servi-cer of the note and it cannot be held liable under the Servicer Act provision. A servi-cer may include the person who made or holds the loan if that person also services the loan. 12 U.S.C. § 2605(i)(2).
 

 In this case, however, there is no countervailing affidavit or any other evidence that Bank of New York is the servi-cer of the loan. There is undisputed evidence that Fairbanks is the servicer. What is disputed is whether Ms. Parnell ever had notice of Fairbanks’ exclusive address for directing a “qualified written request.” That issue is not material to this case. Whether Fairbanks provided adequate notice concerns its servicer’s statutory responsibilities and not the duty of the nonservicer holder, the bank.
 

 Thus, the trial judge did not err in finding as a matter of law that Ms. Parnell had no RESPA claim against the bank.
 

 IzfiLa.C.C.
 
 art. 2315 Claim for Damages for Wrongful Seizure
 

 The bank argued below as it does here that it is entitled to summary judgment as a matter of law because Ms. Parnell has no claim for damages or attorney’s fees as a result of the alleged wrongful seizure.
 
 *893
 
 And, Ms. Parnell has not suffered any damages because the property was only seized and never sold.
 

 The trial judge found that as a matter of law, Ms. Parnell was not entitled to damages for the alleged wrongful seizure and her sole remedy was to seek an injunction. The trial judge based his ruling on the basis that La.C.C.P. art. 2751, the injunction article, makes no provision for damages or attorney’s fees.
 

 Two issues are presented here. First, as a matter of law, notwithstanding Article 2751, is Ms. Parnell otherwise entitled to damages for alleged wrongful seizure? Second, is she entitled to damages if the property was seized but not sold? For the reasons that follow, we find that Ms. Parnell is not barred as a matter of law from seeking damages under Article 2815 for the alleged wrongful seizure although attorney’s fees are not allowed under Article 2815. We also find that damages are permissible in a situation where the property is seized but not sold. Finally, we conclude that there are issues of material fact as to whether the bank acted reasonably in accelerating the note.
 

 Before 1989, La.C.C.P. art. 2751 contained a second paragraph that had been enacted in 1981:
 

 In the event injunctive relief is granted to the defendant, if the court finds the seizure in the executory proceeding to be wrongful, it may allow damages to the defendant. Attorney’s fees for the services rendered in connection with the injunction may be included as an element of the damages.
 

 The 1960 official revision comments state:
 

 (f) The second paragraph to this Article, which was enacted in 1981, is intended to give the trial judge the discretion to award damages and attorney’s fees where the seizure through executory process was | ^wrongful. It is not intended to require that damages and attorney’s fees be awarded in every case where an injunction is issued, for example, where an injunction is issued because of a technical deficiency or a technical error.
 

 In support of its motion for summary judgment, the bank relied on La.C.C.P. art. 2751, which in 1989 deleted the damages and attorney’s fee portion of that article. Currently, Article 2751 provides:
 

 The defendant in the executory proceeding may arrest the seizure and sale of the property by injunction when the debt secured by the security interest, mortgage, or privilege is extinguished, or is legally unenforceable, or if the procedure required by law for an execu-tory proceeding has not been followed.
 

 Ms. Parnell filed a petition seeking to enjoin the executory process proceeding alleging that the procedure required by law had not been followed. In the petition, she sought damages and attorney’s fees under various causes of action. She did not specifically allege that she was seeking damages and attorney’s fees pursuant to Article 2751. Instead, she relied on the article as authority for seeking an injunction. Also, in response to the motion for summary judgment, Ms. Parnell stated that the fact that the legislature amended Article 2751 by deleting language relative to legal fees does not preclude her from pursuing her claim for alleged wrongful seizure damages, and attorney’s fees under other provisions such as the LUTPA. She stated that she had not attempted to use Article 2751 as a basis for damages due to the fact that the law was no longer available at the time of this litigation. Ms. Parnell also argued that the issue of damages was not before the trial judge on summary judgment because the summary
 
 *894
 
 judgment was solely based on liability. However, she stated she was damaged by the alleged wrongful seizure because she experienced humiliation, mental anguish, and pain and suffering because she was required to pay a higher price for insurance.
 

 |27The bank now argues that only Article 2751 governs here. The bank also states that it voluntarily stopped all foreclosure proceedings and Ms. Parnell never lost title to or possession of the property since the loan has been paid in full and the mortgage has been canceled. Therefore, the bank argues that Ms. Parnell has no claim for damages or attorneys fees. In her brief before this court, Ms. Parnell concedes that the property was never actually sold. However, she contends that the filing of the lawsuit and seizing of the property caused her damage.
 

 Ms. Parnell states that the broadest coverage for damages is provided by La.C.C. art. 2815, which pertinently provides: “Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”
 

 Ms. Parnell states that she also included LUTPA as another source of recovery. She maintains that Article 2751 did not eliminate those other causes of action.
 

 We have previously addressed Ms. Parnell’s other claims for damages: LUT-PA, RESPA, and HOEPA. We find that Article 2751 did not eliminate those causes of action, nor did it eliminate her action for damages for alleged wrongful seizure under La.C.C. art. 2315.
 

 Before 1981, Article 2751 had no provision for damages or attorney’s fees. Despite the fact that Article 2751 had no such provision, Louisiana jurisprudence recognized that an action for damages for wrongful seizure could be maintained. In 1976, the Louisiana Supreme Court recognized that “[a] party aggrieved by [a] wrongful seizure is entitled to recover not only special damages caused him thereby, but also general damages (if proven) by way of mortification, humiliation, mental worry, etc. caused by this intentional violation of his property rights.”
 
 Nassau Realty Co., Inc. v. Brown,
 
 382 So.2d 206, 211 (La.1976) (Citations omitted).
 

 LaThe bank’s position that would limit Ms. Parnell’s remedy to an action seeking to retard the seizure and sale is inconsistent with that taken by the Louisiana Supreme Court in
 
 Levine v. First National Bank of Commerce,
 
 06-394, pp. 2, 19-20 (La.12/15/06), 948 So.2d 1051, 1054, 1065. In
 
 Levine,
 
 the Louisiana Supreme Court considered a damage claim for wrongful seizure of immovable property through ex-ecutory process.
 
 [8]
 
 In that case, the parties entered into a mortgage in 1996, after the 1989 amendment to Article 2751. The mortgagor sought damages and injunctive relief for the alleged wrongful seizure. The Court found that the mortgagor was not entitled to damages for wrongful seizure because the seizure was not wrongful. One of the cases relied on by the Court for allowing damages for wrongful seizure in an executory process proceeding predated the 1989 amendment:
 
 Moore v. Louisiana Bank & Trust Co.,
 
 528 So.2d 606 (La.App. 2 Cir.),
 
 writ denied,
 
 531 So.2d 269 (1988). The Court cited Moore for the proposition that a plaintiff must show illegal conduct accompanying seizure in order to obtain damages. In Moore, the Second Circuit considered a 1985 executory process proceeding that concerned a 1983 note. During that time, Article 2751 contained the
 
 *895
 
 damages and attorney’s fee paragraph. The Moore court, however, did not cite Article 2751 as authority for damages for alleged wrongful seizure. Rather, the court cited 1964 and 1980 cases that predated the 1981 amendment to Article 2751, which added the damages and attorney’s fee paragraph. Thus, even before Article 2751 contained the damage provision, and after the article removed the provision, Louisiana jurisprudence recognized that damages for wrongful seizure were otherwise recoverable.
 

 Rain
 
 Escat v. National Bank of Commerce in New Orleans,
 
 256 So.2d 786, 787-88 (La.App. 4 Cir.1972),
 
 overruled on other grounds by General Motors Acceptance Corp. v. Meyers,
 
 385 So.2d 245 (La.1980)
 
 (Escat I), a
 
 case that predated the damage provision, the Fourth Circuit held: “Our jurisprudence has long recognized and awarded damages for the illegal seizure of realty.” Thus, the court found that the plaintiffs petition seeking damages for the wrongful seizure of her property did state a cause of action against the defendant.
 

 Moreover, this court has held:
 

 Damages for wrongful seizure are allowed after an illegal seizure. This award can include damages in compensation for embarrassment, humiliation, mental anguish and worry.
 
 Moore v. Louisiana Bank and Trust Company,
 
 528 So.2d 606, 614 (La.App. 2 Cir.),
 
 writ denied,
 
 531 So.2d 269 (La.1988);
 
 Taylor v. Hancock Bank of Louisiana,,
 
 95-0666 (La.App. 1 Cir. 11/9/95), 665 So.2d 5, 7. Under La.C.C. article 2315 a plaintiff must first show the seizure was illegal or wrongful. The duty/risk analysis in Louisiana law requires that the plaintiff further shows that the wrongful seizure was caused by the fault of one who owed a duty to the plaintiff, and that there was a breach of this duty.
 
 Taylor v. Hancock Bank of Louisiana, supra.
 

 Dixie Sav. and Loan Ass’n v. Pitre,
 
 99-154, [p.] 17 (La.App. 5 Cir.1999), 751 So.2d 911, 921,
 
 writ denied,
 
 99-2867 (La.12/10/99), 751 So.2d 855.
 

 As a general rule, Louisiana law does not provide for the recovery of attorney fees in the absence of a specific statutory provision allowing such recovery or a contractual agreement by the parties to pay attorney fees.
 
 Kinsinger v. Taco Tico, Inc.,
 
 03-622, p. 4 (La.App. 5 Cir. 11/12/03), 861 So.2d 669, 671-72. Prior to 1981, Article 2751 did not provide attorney fees for the improper use of executory proceedings. Thereafter, until 1989, the attorney fees were allowed. In
 
 General Motors Acceptance Corp. v. Meyers,
 
 385 So.2d 245, 247-48 (La.1980) (Citations omitted), a pre-1981 case, the Louisiana Supreme Court disapproved of |Sftthe line of cases from the Courts of Appeal allowing attorney’s fees in the case of executory process.
 

 We next consider whether Ms. Parnell can recover damages for wrongful seizure when the property was never actually sold but only seized.
 

 In
 
 Escat v. National Bank of Commerce in New Orleans,
 
 256 So.2d 786, 787-88 (La.App. 4 Cir.1972),
 
 overruled on other grounds by General Motors Acceptance Corp. v. Meyers,
 
 385 So.2d 245 (La.1980)
 
 (Escat I),
 
 the court rejected the defendant’s contention that the plaintiff had no cause of action because she suffered no actual damage since the seizures effected under the executory proceedings were “constructive” in nature and the owner was not deprived of the physical possession of the property. The court ruled that this had no bearing on the merits of the exception of no cause of action, but, rather, would more properly address itself to the issue of quantum in the event the defendant was cast in judgment.
 
 Accord: Escat v. National Bank of Commerce in New
 
 
 *896
 

 Orleans,
 
 284 So.2d 832 (La.App. 4 Cir.1978),
 
 overruled on other grounds by General Motors Acceptance Corp. v. Meyers,
 
 385 So.2d 245 (La.1980)(Escat II).
 

 In
 
 Phillips v. Great Southern Mortg. & Loan Corp.,
 
 350 So.2d 1279 (La.App. 3 Cir.1977), the court upheld a damage award where as a result of the seizure the plaintiffs were not deprived of the physical possession of their property. The seizure was only constructive. The court opined: “We entertain little doubt however, that plaintiffs suffered some humiliation and mental worry as a result of defendant’s violation of their property rights.” 350 So.2d at 1282.
 

 Ms. Parnell, however, must prove her damage claim but she is not barred as a matter of law from proving her entitlement to damages assuming that she also proves a wrongful seizure. “Although it is true that a party aggrieved by a wrongful seizure is entitled to general and special damages, he must nevertheless Improve that he did sustain damages.”
 
 Rao v. Towers Partners, L.L.C.,
 
 96-1529, p. 6 (La.App. 4 Cir. 2/12/97), 688 So.2d 709, 712,
 
 writ denied,
 
 97-0820 (La.5/30/97), 694 So.2d 246.
 

 Finally, we consider whether there are issues of material fact as to Ms. Parnell’s damage claim for purposes of her Article 2315 cause of action. We emphasize that we do not consider in this discussion the effect of Ms. Parnell’s claim for rescission under HOEPA.
 

 Ms. Parnell makes two arguments regarding alleged wrongful seizure. First, she argues that she was not in default. Second, she argues that the bank wrongfully accelerated the loan.
 

 On October 16, 2004, the bank filed the petition alleging that Ms. Parnell defaulted on the note and mortgage by failing to pay when due the monthly installment for September 2003 and had remained in default by failing to pay in full all successive monthly installments. In support of the motion for summary judgment, the bank submitted an affidavit from Diane Wein-berger. She attested that she is employed by Fairbanks as Director. She averred that Fairbanks became Select Portfolio Servicing Inc. on June 30, 2004. She attested that she examined the records of Fairbanks and Select regarding Ms. Parnell mortgage. She said that the records were made at or near the time of the events described therein and from information transmitted by persons with knowledge of the events described herein who were routinely acting for Fairbanks and Select in recording the information described herein. She said that the records were kept in the course of regularly conducted business activities and it was Fairbanks’ and Select’s regular practice to make and keep these records. She also attested that the records reflected that Ms. Parnell failed to submit any payments due in September 2003 or thereafter. She further attested that Ms. Parnell submitted to Fairbanks two money orders dated | ¡¡¡¿December 5, 2003, each in the amount of $725 but those money orders were insufficient to cure Ms. Parnell’s default.
 

 Ms. Parnell submitted her affidavit in opposition to the motion for summary judgment. She attested that she was not in default, having made payments in September 2003 and thereafter. Also, she attested that Fairbanks returned $2,186.75 around June 2003, as indicated by attached exhibits, and that Fairbanks returned $1,450 on December 23, 2003, as evidenced by attached exhibits. Ms. Parnell averred that Fairbanks, as indicated by attached exhibits, returned her payments by two checks around December 5, 2003, stating that it
 
 “could not accept payment until the dispute is resolved.”
 
 She alleged that
 
 *897
 
 these money orders stated that “these payments are paid under protest, all rights reserved.”
 

 For purposes of Ms. Parnell’s Article 2315 claim, we must determine whether there is an issue of material fact regarding whether Ms. Parnell was not in default and therefore entitled to damages for a wrongful seizure. We conclude that the returned checks, which predated the date of the alleged September default, are not determinative. Rather, pertinent to our inquiry is whether Ms. Parnell has raised a genuine issue of material fact regarding whether she was in default since September 2003, which was the triggering date of default.
 

 Ms. Parnell relies on two money orders attached to her affidavit with an accompanying letter from Fairbanks. The money orders are dated December 5, 2003. Each is for the amount of $725. The money orders reference the date of September 7, 2003 and October 7, 2003, respectively. The attached letter dated December 23, 2003 from Fairbanks states that the office could not accept the payment at that time until “dispute is resolved.” The letter further asked Ms. Parnell to contact their office “for the amount required to bring her loan current.” Ms. Parnell only attached these two money orders to show that she was not in | ^default after September 2003. However, she was already in default on the September 2003 payment by the time she had submitted her December 2003 payment. And, she was already in default for the October 2003 payment by the time she submitted her December 2003 payment. Furthermore, she attached no money order referencing the November 2003 payment. Therefore, there is no issue of material fact regarding whether Ms. Parnell was in default at the time the bank sought executory process.
 

 Section 11 of the mortgage provides in pertinent part:
 

 [E]xcept for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at any such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender’s address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Security Instrument shall be deemed to be given to Borrower or Lender when given in the manner designated herein.
 

 Section 18 of the mortgage provides for acceleration and remedies. It states (emphasis in original; footnote added):
 

 Lender shall give notice to Borrower prior to acceleration following Borrower’s breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraphs 14 and 17 unless applicable law provides otherwise).
 
 [9]
 
 The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Interest and sale of the Property.
 

 
 *898
 
 The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured |;Mby this Security Instrument without further demand and may cause the property to be seized and sold under either ordinary or executory process, with or without appraisement, to the highest bidder for cash. Borrower hereby confesses judgment in favor of Lender and any future holder of the Note in the full amount of all sums secured by this Security Interest, including but not limited to attorneys’ fees of 25% of the sums due under the Note, but not less than $25.
 

 In its petition, the bank alleged that it mailed notice to Ms. Parnell prior to acceleration specifying the breach; the action required to cure such breach; a date not less than 30 days from the date the notice was mailed by which such breach must be cured; a failure to cure such breach on or before the date specified in the notice would result in acceleration of sums secured by the mortgage; that the borrower had the right to reinstate after acceleration and the right to assert non-existence of the default or any of the defense of defendants to acceleration and foreclosure; and, that if the breach was not cured on or before the date specified in the notice, plaintiff could declare all of the sums by the mortgage to be immediately due and payable without further demand that the property could be seized and sold to satisfy the indebtedness due.
 

 In her petition, Ms. Parnell alleged that the bank was not due an order of seizure and sale since it had no right to accelerate the loan. She alleged that in the petition for executory process, the bank alleged that it sent Ms. Parnell the 30-day notice letter as required by the mortgage for acceleration by it gave no specific details. She states that she never received any letter. Therefore, the bank did not have the right to accelerate.
 

 In her affidavit, Ms. Parnell attested that she did not receive any notice of default. In response, the bank submitted the affidavit of Ms. Weinberger. Ms. Weinberger attested that she was familiar with Fairbanks’ usual mailing procedures for notifying mortgagors of an acceleration of their mortgages and notes for failure lasto make payments. Fairbanks’ usual mailing procedures for notifying mortgagors an acceleration of the note and mortgage include: (1) generating a notification letter; (2) addressing the letter to the customer; (3) applying proper postage to the letter for delivery by certified mail; and (4) delivering the addressed, postage-paid letter to the U.S. Postal Service for delivery by certified mail. She attested that Fairbanks followed these procedures for mailing demand letters in October 2003. And, the records of Fairbanks reflect that on October 21, 2003, Fairbanks sent a demand letter to Ms. Parnell at 2093 Lincolnshire Dr., Marrero, LA 7072 by Fairbanks’ usual mailing procedures. She attested that the attached letter was a true and correct copy.
 

 The attached October 21, 2003 letter does not contain any indication that it was sent by certified mail and there is no return receipt attached to the letter indicating that Ms. Parnell received it. In addition, Ms. Weinberger did not state that she personally sent this particular letter by certified mail to Ms. Parnell. Therefore,
 
 *899
 
 the fact that Ms. Parnell has attested that she did not receive the notice, which was required under the mortgage to be sent by certified mail, creates an issue of material fact as to whether the bank complied with the mortgage requirements for acceleration.
 

 The bank argues whether Ms. Parnell received notice is irrelevant, citing the case of
 
 Mortgage Elec. Registration Systems, Inc. v. Daigle,
 
 08-1208 (La.App. 5 Cir. 3/24/09), 10 So.3d 288,
 
 writ denied,
 
 09-0826 (La.5/29/09), 9 So.3d 167.
 
 Daigle
 
 is distinguishable.
 

 In
 
 Daigle,
 
 this court held that the debt- or’s allegation that she had no notice of default was not relevant to her damages action based on alleged wrongful foreclosure. In that case, the court reasoned that the debtor knew that she had to make monthly payments, and foreclosure proceedings were not instituted until two |S)imonths after the debtor’s last payment was made. 08-1203 at 10, 10 So.3d at 294. The debtor failed to show that she would be able to carry her burden of proving her defense of payment. In addition, the note provided for notice by delivery or mail without requiring certified mail. And, the affidavit of the holder’s employee attested that the default notification letter was mailed as provided in the note.
 
 Id.
 

 Daigle
 
 did not concern the claim here that the holder failed to take the required affirmative act necessary to accelerate the note. Thus, unlike
 
 Daigle,
 
 the required affirmative act is relevant because without that affirmative act, the bank had no right to accelerate the note.
 

 The general rule regarding promissory notes is that a clause allowing the holder to accelerate maturity at the holder’s option is not operative until the holder takes some affirmative action clearly and unequivocally evidencing the intention to the maker.
 
 Rivers v. Rivers,
 
 404 So.2d 1300,1302 (La.App. 2 Cir.1981) (citations omitted). Under the contractual terms of the mortgage, the bank was required to take the affirmative act of mailing by certified mail a specified notice before accelerating the note. The right to accelerate unpaid installments does not arise until this action is taken.
 
 Fabacher v. Hammond Dairy Co., Inc.,
 
 389 So.2d 87, 92 (La.App. 4 Cir.1980).
 
 Accord: Shane v. Winter Hill Federal Sav. and Loan Ass’n,
 
 397 Mass. 479, 483, 492 N.E.2d 92 (Mass.1986) (An affirmative decision was necessary in order to trigger the defendant’s obligation to give notice and opportunity to cure.).
 

 We find that the trial judge erred in finding that it was of no moment whether Ms. Parnell actually received the notice. We also find that in view of the fact that there is no indication that Ms. Weinberger had personal knowledge of the mailing by certified mail or that the letter indicates it was mailed by certified mail, there is an issue of material fact as to whether the bank complied with the Remortgage contractual requirements in taking the affirmative action necessary to accelerate the note.
 

 Decree
 

 Upon
 
 de novo
 
 review of the record, and considering the pertinent law and jurisprudence, we conclude the following: (1) The trial court erred in granting summary judgment in favor of the Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2, who was not entitled to summary judgment as a matter of law on the issue of Ms. Parnell’s claim for damages for alleged wrongful seizure. Under La.C.C. art. 2315, damages for wrongful seizure are recoverable. Furthermore, damages are recoverable although the property was seized but not sold, provided that Ms. Parnell sustains her burden of proving damages. Addition
 
 *900
 
 ally, damages for wrongful acceleration of the note are recoverable and issues of material fact remain as to whether the bank took the required affirmative act to accelerate. Accordingly, we reverse the judgment insofar as it grants summary judgment dismissing Ms. Parnell’s claim for alleged damages for wrongful seizure and disallowing these items of damages. (2) The trial court erred in granting summary judgment in favor of the Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2, who was not entitled to summary judgment as a matter of law on the issue of Ms. Parnell’s HOEPA claim. Accordingly, we reverse the judgment insofar as it grants summary judgment dismissing Ms. Parnell’s HOE-PA claim. (3) The trial judge correctly granted summary judgment dismissing the LUTPA claim. We conclude that the Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2 is exempt under LUTPA. Accordingly, the portion of the judgment dismissing the LUTPA claim is affirmed. (4) The trial judge did not err in finding as a matter of law that Ms. Parnell had no RESPA claim against the Bank of New |MYork acting solely in its capacity as Trustee for EQCC Trust 2001-2. We conclude that there is no countervailing affidavit or any other evidence that the Bank of New York acting solely in its capacity as Trustee for EQCC Trust 2001-2 is the servicer of the loan. Accordingly, the portion of the judgment dismissing the RESPA claim is affirmed.
 

 This matter is remanded to the trial court for further proceedings consistent with the views expressed herein.
 

 REVERSED IN PART; AFFIRMED IN PART, AND REMANDED.
 

 [1]
 

 . Appellant repeatedly refers to “the bank” as "the trust” arguing that it was the trust that
 
 *880
 
 filed the suit for executory process rather than the bank. We refer to the appellee herein as "the bank” although we recognize its status as a trustee.
 

 [2]
 

 . In its memorandum in support of the motion for summary judgment, the bank alleged that the loan has been paid in full from insurance proceeds following Hurricane Katrina and that the mortgage has been canceled.
 

 [3]
 

 . 15 U.S.C. § 1602(aa) pertinently provides:
 

 (aa)(l) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer’s principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—
 

 (B) the total points and fees payable by the consumer at or before closing will exceed the greater of—
 

 (i) 8 percent of the total loan amount; or
 

 (ii) $400
 

 [4]
 

 . We note, however, that 2000 La.Acts, 1st Ex.Sess. No. 34, § 4 pertinently provided that the provisions were intended to clarify existing law and therefore were corrective and remedial and applied to all existing transactions. Accordingly, the clarifying statute may be regarded as interpretive and given retrospective effect because it does not change, but merely clarifies, pre-existing law.
 
 State Farm Mut. Auto. Ins. Co. v. Noyes,
 
 02-1876 (La.App. 1 Cir. 2/23/04), 872 So.2d 1133.
 

 [5]
 

 . In 2006, after the executory process proceeding was filed, the Legislature again amended R.S. 51:1406(1) by 2006 La.Acts, No. 171 § 1, effective August 15, 2006 to read in pertinent part as follows:
 

 The provisions of this Chapter shall not apply to:
 

 Any federally insured financial institution, its subsidiaries, and affiliates or any licensee of the Office of Financial Institutions, its subsidiaries, and affiliates or actions or transactions subject to the jurisdiction of the Louisiana Public Service Commission or other public utility regulatory body, the commissioner of financial institutions, the insurance commissioner, the financial institutions and insurance regulators of other states, or federal banking regulators who possess authority to regulate unfair or deceptive trade practices.
 

 [6]
 

 .La. R.S. 6:101 provides for the establishment of the Office of Financial Institutions as a state agency.
 

 [7]
 

 . The provision states in pertinent part:
 

 (f) Unfair or deceptive acts or practices by banks, savings and loan institutions, or Federal credit unions; promulgation of regulations by Board of Governors of Federal Reserve System, Federal Home Loan Bank Board, and National Credit Union Administration Board; agency enforcement and compliance proceedings; violations; power of other Federal agencies unaffected; reporting requirements
 

 (1) In order to prevent unfair or deceptive acts or practices in or affecting commerce (including acts or practices with are unfair or deceptive to consumers) by banks ... each agency ... shall establish a separate division of consumer affairs which shall receive and take appropriate action upon complaints with respect to such acts or practices by banks ... subject to its jurisdiction. The Board of Governors of the Federal Reserve System ... shall prescribe regulations to carry out the purposes of this section, including regulations defining with specificity such unfair or deceptive acts or practices, and containing requirements prescribed for the purpose of preventing such acts or practices.
 

 [8]
 

 .
 
 See, Levine v. First National Bank of Commerce,
 
 05-106, p. 3 (La.App. 5 Cir. 12/27/05), 917 So.2d 1235, 1238 (“This suit originated as an executory proceeding by the Bank to foreclose on property located in Gretna, Louisiana.”).
 

 [9]
 

 . Section 14 refers to legislation affecting the lender’s rights and Section 17 refers to the transfer of the property or a beneficial interest in the borrower.